147 T.C. No. 9

UNITED STATES TAX COURT

EXELON CORPORATION, AS SUCCESSOR BY MERGER TO UNICOM
CORPORATION AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

EXELON CORPORATION AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 29183-13, 29184-13.　　　　Filed September 19, 2016.

P, a corporation engaged in the production, transmission, and
distribution of electricity to residential, commercial, and industrial
customers in Northern Illinois, sold its fossil fuel power plants in
1999 for $4.813 billion. Seeking to manage the taxable gain of $1.6
billion resulting from the sale, P pursued a series of like-kind
exchanges employing sale-leaseback strategies between P and
unrelated third parties C and M, each of the latter a tax-exempt public
utility. P fully funded the transactions using the proceeds from the
sale of its own power plants. In the transactions, C or M would lease
a power plant to P for a term exceeding the plant's useful life,
receiving in turn a lump-sum payment of cash, and P would sublease
the power plant back to C or M. Part of the amount paid to C or M
would be returned to P as a prepayment of the sublease, another part
would be set aside for investment and to secure a cancellation option

allowing C and M to purchase back their power plants at the end of the sublease periods, and the remainder would be retained by C and M and used for their own needs. Since exercising the cancellation options was expected to be the only economically viable option, the parties to the transactions anticipated that at the end of the sublease periods C and M would exercise their cancellation options and regain ownership of the power stations leased to P. The primary tax benefits that P expected to derive were from the deferral of income tax under I.R.C. sec. 1031 and various deductions related to the replacement properties. P identified appropriate replacement properties, conducted due diligence, and closed the transactions within the timeframes provided for in I.R.C. sec. 1031.

Held: The agreements between P and C and M are not true leases but rather properly characterized as loans since the transactions did not transfer the benefits and burdens of ownership to P. The substance of the transactions is not consistent with their form.

Held, further, P did not satisfy the requirements of I.R.C. sec. 1031 for the 1999 tax year since P exchanged power plants for an interest in financial instruments.

Held, further, P is not entitled to depreciation deductions claimed for 2001 with respect to its transactions with C and M.

Held, further, P may not deduct interest or include rental income with respect to the transactions with C and M for the 2001 tax year since the transactions are not lease agreements for Federal tax purposes under I.R.C. sec. 467.

Held, further, P must include in income for the 2001 tax year original issue discount income arising out of P's equity contribution, which is to be repaid with interest through the cancellation options in P's agreements with C and M.

Held, further, P is not entitled to deduct transaction costs related to its transactions with C and M for its 2001 tax year and must instead include them as an additional amount lent to C and M.

Held, further, P is liable for accuracy-related penalties under I.R.C. sec. 6662 for the 1999 and 2001 tax years on the grounds of negligence or disregard of rules or regulations. P did not show reasonable cause and good faith under I.R.C. sec. 6664(c) to meet the exception for those penalties.

David F. Abbott, Joel V. Williamson, Erin G. Gladney, Kristin M. Mikolaitis, Andrew W. Steigleder, Michelle A. Spiegel, and Michael D. Educate, for petitioner.[1]

Matthew I. Root, Elizabeth P. Flores, Steven N. Balahtsis, Abigail F. Dunnigan, Lisa M. Goldberg, Casey R. Kroma, and Michael T. Shelton, for respondent.

---

[1]Natasha Goldvug represented petitioner at trial. On October 28, 2015, she filed a motion to withdraw as counsel for petitioner, which the Court granted on October 29, 2015.

LARO, Judge: These cases are consolidated for purposes of trial, briefing, and opinion. Respondent determined the following deficiencies and penalties in petitioner's[2] Federal income tax in timely issued notices of deficiency:

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 1999 | $431,174,592 | $86,234,918 |
| 2001 | 5,534,611 | 1,106,922 |

Petitioner timely filed petitions with the Court seeking redetermination of these deficiencies and penalties.

The deficiencies at issue arise out of petitioner's participation in six transactions that respondent labeled sale-in/lease-out (SILO) transactions in an alleged like-kind exchange under section 1031.[3] The transactions are as follows:

| Counterparty | Transaction name |
|--------------|------------------|
| City Public Service | Spruce |
| Municipal Electric Authority of Ga. | Scherer 1, Scherer 2, Scherer 3 |
| Municipal Electric Authority of Ga. | Wansley 1, Wansley 2 |

[2]In this Opinion, references to petitioner include both Exelon Corp. and Exelon Corp. as successor to Unicom Corp., which merged with Exelon Corp. on October 20, 2000, and thereafter went out of existence.

[3]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) as applicable for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded to the nearest dollar.

The parties have agreed, with the Court's approval, to reduce the number of transactions to be tried to three "test transactions": Spruce, Scherer 1 (Scherer), and Wansley 1 (Wansley), and to apply the Court's methodology in this Opinion to the remaining transactions.[4]

The parties have resolved two issues by filing stipulations of settled issues with the Court. The parties have agreed that petitioner is entitled to the benefits of interest netting as provided in section 6621(d) for 1999, the amount of which will be determined after the parties submit Rule 155 computations. The parties have also agreed that petitioner is not subject to the penalty under section 6662 for the 2001 tax year for an underpayment due to a substantial understatement of income tax, although petitioner still may be subject to the section 6662 penalty for 2001 on account of negligence or disregard of rules or regulations.

We decide the following issues:

1. whether the substance of the test transactions is consistent with their form. We hold that it is not;

2. whether petitioner has satisfied the requirements of section 1031. We hold that it has not;

---

[4]Our rulings in this Opinion with respect to Wansley 1 will be determinative for Wansley 2. Our rulings with respect to Scherer 1 will be determinative for Scherer 2 and Scherer 3.

3. whether petitioner is entitled to depreciation deductions claimed for 2001 with respect to the test transactions. We hold that it is not;

4. whether petitioner must include in income in 2001 original issue discount income related to the test transactions. We hold that it must;

5. whether petitioner is entitled to deduct amortized transaction costs related to test transactions for its 2001 tax year. We hold that it is not; and

6. whether petitioner is liable for penalties under section 6662 for the 1999 and 2001 tax years. We hold that it is.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations of fact and the facts drawn from stipulated exhibits are incorporated herein, and we find those facts accordingly. At the time of filing the petitions, Exelon, the primary petitioner, had its principal place of business in Chicago, Illinois. The parties agree that these cases are appealable to the Court of Appeals for the Seventh Circuit.

### Background

I.  Exelon and Its Subsidiaries

Commonwealth Edison Co. (ComEd) was organized in Illinois on October 17, 1913, as a result of the merger of Cosmopolitan Electric Co. into ComEd.

Unicom Corp. (Unicom) was created in January 1994 as a holding company for ComEd. Unicom Investment, Inc. (UII), was created on April 23, 1999, as a wholly owned subsidiary of Unicom.

Exelon Corp. (Exelon), petitioner in these cases and the successor by merger to Unicom and its consolidated subsidiaries (Unicom Group), was incorporated in February 1999. Exelon became the parent corporation of PECO Energy Co. (PECO) and Unicom through merger on October 20, 2000. As a result of the merger of Exelon and Unicom, Unicom went out of existence. After the merger, Exelon wholly owned PECO and owned more than 99% of ComEd.

Both Unicom and Exelon used the calendar year as their tax year. Both companies were accrual basis taxpayers during all relevant periods.

II.     Unicom's Decision To Sell Fossil Fuel Power Generation Assets

        A.      ComEd's Power Generation Business in 1999

In 1999 ComEd engaged in the production, transmission, and distribution of electricity to residential, commercial, and industrial customers in Northern Illinois. ComEd operated in Chicago, Illinois, under a nonexclusive electric franchise ordinance. ComEd received approximately one-third of its ultimate revenues from customers in Chicago.

In addition, ComEd operated its electric business outside of Chicago in 395 municipalities under nonexclusive franchises that were received under certificates of convenience and necessity granted by the Illinois Commerce Commission (ICC). ComEd owned and operated a full spectrum of assets necessary to produce and deliver electricity to its customers, including power generation plants (both fossil fueled and nuclear fueled), the high-voltage transmission system which transported the electricity from the generators to the service areas, and the low-voltage distribution system needed to provide the electricity to end users.

B.     Deregulation of the Electric Industry and Unicom

The 1990s marked a shift in the regulatory framework for the electric industry. Before 1996 most electric utility companies were vertically integrated conglomerates which, similarly to ComEd, owned a full spectrum of assets for production and delivery of electricity to the customers. By April 1996 the Federal Energy Regulatory Commission (FERC) had issued final rules requiring nondiscriminatory access to the transmission grid controlled by vertically integrated utilities.

These rules opened the market to smaller utilities and power generators and provided an opportunity for the formation of "wholesale" energy companies. Instead of investing in their own transmission capacity, smaller energy producers

could now use the transmission system already in place regardless of who owned it to deliver power to their customers.

Many States pursued their own restructuring strategies for electric industry deregulation, some of them requiring separation of power generation from sales to final customers. On December 16, 1997, Illinois enacted the Electric Service Customer Choice and Rate Relief Law, codified at 220 Ill. Comp. Stat. Ann. 5/16-101 to -130 (West 2013). Unlike other States, Illinois did not enact deregulation legislation requiring divestiture of power generation and allowed electric utilities a choice of how they wished to pursue the transition.

These regulatory changes resulted in the transformation of the power industry by the early 2000s from a number of separate vertically integrated utilities to a network of businesses where the various elements of the supply chain were being operated separately and interacted through market-based contracts and power exchanges.

To face the challenges of the changing market, Unicom decided to evaluate its operations in Illinois, including its nuclear and fossil fuel power plants. Although Unicom management believed the company was well positioned to succeed in the new market structure, the study revealed that Unicom would have to make significant changes to its operation model in order to stay competitive

long term. Unicom and ComEd considered multiple options, including continued operation with accelerated depreciation, indefinite suspension from operation, a sale of assets to a third party, and retirement or closure of assets. Unicom needed of cash to maintain and expand its nuclear generation facilities and distribution system. After determining that operation of fossil fuel power plants would bring less value than immediate sale, Unicom decided in July 1998 that it was time to divest itself entirely of its fossil-fueled power generation business. At that time Unicom estimated it would receive approximately $2.5 billion from the sale.

C.     Unicom's Sale of the Fossil Fuel Power Plants

Unicom started looking for an appropriate buyer for its fossil fuel power plants in 1999. One prospective buyer offered Unicom $3 billion for the plants. Unicom's management, however, believed that the company could get a better deal. Eventually, Edison Mission offered Unicom $4.8 billion for the fossil fuel power plants, almost twice the initial estimate.

The $4.8 billion offer would enable ComEd to upgrade its nuclear plants and make the necessary investments in its distribution system. On March 22, 1999, ComEd entered into an asset sale agreement with Edison Mission (EME agreement). To effect the sale, ComEd transferred its interests in the fossil fuel power plants to UII pursuant to an agreement dated May 11, 1999, subject to the

EME agreement. UII agreed to pay ComEd $4.813 billion for the assets, in the form of a demand note in the amount of $2.35 billion and the difference in interest-bearing term notes.

After receipt of the assets, UII would immediately transfer the assets to Edison Mission and receive $4.813 billion in cash. Immediately after receipt of the cash, UII would pay the $2.35 billion aggregate principal due to ComEd under the demand note. UII would pay the amount due under the demand note with interest-bearing term notes. Upon the notes' maturity, UII would pay the principal amount of the notes. Edison Mission acted through its subsidiary, Midwest Generation. Deloitte & Touche LLP Valuation Group (Deloitte) performed a valuation allocating the sale price among the transferred power plants.

On December 15, 1999, UII closed the sale to Edison Mission with respect to two plants, the Collins Generating Station (Collins station or Collins power plant) and the Powerton Generating Station (Powerton station or Powerton power plant) for $930 million and $870 million, respectively. These stations together had a book value of approximately $1.3 billion at the time of the sale. Pursuant to EME agreement terms, UII transferred the Collins and Powerton stations to State Street Bank & Trust Co. (State Street), the qualified intermediary for the putative like-kind exchange described more fully in the following sections, and State Street

then transferred the stations to Edison Mission in exchange for the consideration described above.

In its filings with the ICC, ComEd represented that the sale would not impair ComEd's obligations to provide power to customers because ComEd would be buying back the output generated by the sold power plants for a number of years and would also be able to buy energy on the open market. ComEd planned to reinvest some of the proceeds in its remaining lines of business and to pay the transaction expenses.

III.    Unicom's Search for Tax Planning Opportunities

After Unicom announced the planned sale of the fossil fuel power plants in May 1999, it became clear that there would be a large taxable gain resulting from the sale. Unicom diligently searched for opportunities to minimize the tax impact and to reinvest some of the proceeds of the sale.

Richard Roling, assistant vice president of tax and assistant comptroller at Unicom from the early 1990s through 2001, was responsible for the tax function at Unicom, including filing tax returns, planning, research, and ensuring compliance with the tax laws. In 1999 Mr. Roling reported to Robert E. Berdelle, controller of Unicom at the time. Mr. Berdelle's responsibilities included safeguarding Unicom's assets, maintaining books and records, and issuing financial reports and

regulatory filings.  Furthermore, Mr. Berdelle supervised Unicom's tax department, along with Unicom's business planning and other functions.

Mr. Roling approached Arthur Andersen (Unicom's auditor at the time), Pricewaterhouse Coopers (PwC), and Deloitte to identify the appropriate tax strategy.  Arthur Andersen presented Unicom with a strategy involving a foreign currency swap, but Mr. Roling rejected it because it was too complex and did not align with the existing Unicom business.  PwC first presented the idea of a like-kind exchange coupled with a sale-leaseback to Unicom sometime in August and September 1999.

In essence, PwC suggested that its strategy would allow Unicom to defer the recognition of gain on Unicom's sale of the fossil fuel power plants through a section 1031 like-kind exchange into a "passive leveraged lease investment." Instead of paying the tax on the gain, Unicom would be able to reinvest that sum. The deferred tax would be financially similar to a 0% borrowing note.  By reinvesting it, Unicom could receive a significant yield premium.  Moreover, leveraging the new lease in such a manner would leave Unicom in substantially the same cash position.

The PwC strategy envisioned a lease term in the range of 20-25 years with an "enhancement and defeasance structure providing for AA rated or better

enhancement of the lessee's entire financial obligations to Unicom." PwC compared the costs for maintaining the new lease investment with maintaining a typical debt private placement. Under the strategy, Unicom would lease the exchange assets to the lessee under a triple net lease with an end-of-term fixed purchase option. Unicom would pass on a portion of its tax deferral benefit to the lessees through a reduction in rental obligation. The lessee would "defease its rental obligations, and thereby monetize the lower rental cost into an upfront cash benefit."[5]

PwC pointed out to petitioner that municipal utilities and rural electric cooperatives seeking to monetize tax benefits they could not use because of their tax-exempt status would be interested in entering into a sale-leaseback transaction. PwC also suggested that taxable entities desiring to obtain low cost/off-balance-sheet financing alternatives might also be interested.

After the initial consultation with PwC, Mr. Roling decided to present the idea of the like-kind exchange to his superiors.

---

[5]The final structure of the like-kind exchange and sale-leaseback was different, as explained further in this Opinion.

IV.     Unicom's Decision To Enter Into the Test Transactions

Mr. Roling first presented the PwC strategy to Mr. Berdelle. Although Mr. Berdelle initially did not fully understand the strategy, he decided it had promise and was in line with Unicom's tax strategy. John C. Bukovski, the chief financial officer of Unicom, gave Mr. Roling permission to move forward with the like-kind exchange strategy and present it to the Unicom's board of directors for consideration and approval.

On October 5, 1999, two months after receiving ICC approval to sell ComEd's fossil fuel power plants, ComEd submitted a notice to the ICC stating that it was considering entering into a like-kind exchange for at least several of the fossil fuel power plants.

On October 14, 1999, Unicom and PwC executed an agreement whereby Unicom retained PwC to act as its financial adviser in connection with the proposed like-kind exchange strategy. On October 20, 1999, Mr. Berdelle provided information on the strategy to Unicom's board of directors. He presented the strategy during the board meeting held on October 27, 1999, seeking and receiving approval for various preliminary steps necessary to pursue the concept and preserve the option of entering into a like-kind exchange transaction.

Mr. Berdelle assembled a team to further evaluate the like-kind exchange opportunity. That team consisted of a number of Unicom's employees from various departments, including the tax department, treasury and finance departments, engineers, and outside consultants. Core members of the team, including Mr. Berdelle, Robert Hanley, a tax department employee, and Mr. Roling, would meet weekly, if not more often, to discuss the status of the project.

Neither Mr. Roling nor anyone on his staff in the tax department had any experience with like-kind exchanges. Because Unicom did not have the internal expertise necessary to adequately assess all of the legal and technical aspects of the proposed like-kind exchange, Unicom employed a number of consultants and advisers to work on the project, including performing due diligence of potential replacement properties.

Unicom retained a Chicago law firm, Winston & Strawn LLP (Winston & Strawn) to advise on the legal aspects of the transaction, including its tax consequences. In addition, in March or April of 2000 Unicom engaged Stone & Webster Management Consultants, Inc. (Stone & Webster), to provide engineering and environmental reports on prospective replacement properties. Unicom retained Deloitte to conduct an appraisal of the relinquished properties and potential replacement properties in November 1999. In addition, petitioner

engaged PwC (financial and accounting adviser), Arthur Andersen (accounting adviser), Sidley Austin (regulatory counsel), Vinson & Elkins (Texas counsel), and Holland & Knight (Georgia counsel).

V.    Identification of Properties To be Relinquished in the Like-Kind Exchange

On or about December 9, 1999, six days before the closing of the sale under the EME agreement, Unicom identified the Collins and Powerton stations as the properties it would try to exchange for like-kind replacement properties.  Mr. Roling concluded, on the basis of the valuations from Deloitte, that the fair market value of the Collins station at that time was $930 million, with an expected taxable gain of $823 million, while the fair market value of Powerton station was $870 million, with an expected taxable gain of $683 million.  Unicom did not plan to execute a like-kind exchange for any of the other fossil fuel power plants it was selling.

VI.    Identification of Like-Kind Replacement Properties and Due Diligence

A.    Identification of Replacement Properties

Because section 1031 has a strict timeframe for identification--on or before the 45th day after the date on which the relinquished property is transferred--and acquisition of replacement property--within 180 days of the date on which the relinquished property is transferred (or, if earlier, the transferor's tax return due

date for the year in which the transfer of the relinquished property occurs)--
Unicom started looking for potential replacement properties before the closing of
the sale under the EME agreement.

By November 1999 PwC had identified 26 prospective lessees. Unicom did
not participate in the initial identification process. On or about November 9-10,
1999, PwC, on behalf of Unicom, sent proposals to a number of potential lessees
for the sale-leaseback portion of the like-kind exchange. PwC contacted both
taxable and tax-exempt entities. City Public Service (CPS) and Municipal Electric
Authority of Georgia (MEAG) were among the potential lessees contacted by
PwC. Each proposal sent by PwC contained statements indicating that Unicom
was simultaneously soliciting other prospective lessees for expressions of interest
and that the proposal was subject to due diligence by Unicom and its consultants.
After receiving initial expressions of interest from several potential lessees,
Unicom and its advisers analyzed the submitted materials.

The closing of the sale of the two fossil fuel power plants under the EME
agreement on December 15, 1999, started the clock under section 1031. Unicom
and UII had to identify like-kind replacement properties by January 29, 2000 (45
days from closing), and had to acquire the properties by June 12, 2000 (180 days
from closing).

On January 28, 2000, Unicom timely submitted to State Street, the qualified intermediary, its identification of like-kind replacement properties for both the Collins and Powerton stations. Unicom identified the Spruce station and certain related common facilities owned by CPS as a replacement for the Collins station. Unicom identified a 15.1% undivided interest in the Wansley station and a 30.2% undivided interest in the Scherer station (both owned by MEAG) as a replacement for the Powerton station. Those partial interests in the Wansley and Scherer stations were at that time owned by MEAG as a tenant in common along with Georgia Power Co., Oglethorpe Power Corp., and the City of Dalton, Georgia.

B.      Due Diligence on Replacement Properties

1.      Engineering and Environmental Analysis

Walter Hahn, a mechanical engineer with expertise in plant operability and over 25 years' experience working on power plants, was ComEd's director of technical services in 2000. Mr. Hahn coordinated engineering and environmental analysis efforts for the like-kind exchange project at ComEd. To perform the analysis, Mr. Hahn hired Stone & Webster, an engineering consulting firm that ComEd had previously used for other engineering studies.

Stone & Webster assessed the power plants' contemporaneous condition and expected remaining life, the projected capital costs, operating and

maintenance expenses, and environmental issues relating to the future operations and maintenance of the replacement stations and conducted an environmental permit review and permit compliance assessment. Stone & Webster's review process involved data collection, site visits, and the review and analysis of all information obtained before drafting reports and offering conclusions.

Stone & Webster's team found the Wansley and Scherer stations to be well maintained and in clean and orderly condition, probably in the top 2%-3% of units in the country in generation, efficiency, and overall availability and reliability. Stone & Webster's team found that the Spruce station was also well maintained, was running at good efficiency, and could run at high capacity factors. However, Stone & Webster did uncover certain problems with the plants. For example, Stone & Webster identified stress corrosion cracking in the low pressure turbine sections of the Wansley station. Stone & Webster also raised concerns about the potential for the U.S. Environmental Protection Agency to take action relating to maintenance activities at Wansley. At the Scherer station, Stone & Webster identified spills associated with transformer failures and fires. Unicom chose not to follow up on any of these and other findings.

In addition, two ComEd engineers visited all of the stations before June 2000. Their review, however, was not as thorough as Stone & Webster's and

involved only short site visits and interviews. ComEd engineers did not find any problems with any of the stations.

2.    Appraisal of Replacement Properties

Deloitte prepared appraisal reports for all three replacement properties as well as for the fossil fuel power plants sold by Unicom under the EME agreement. The reports provided current valuations of the replacement properties, as well as valuation opinions as to the plants' residual values and remaining useful lives, and the likelihood of the prospective lessees' being economically compelled to exercise their cancellation or purchase options. In preparing the reports, Deloitte sought to address specific requirements set forth in Internal Revenue Service (IRS) published guidance on leasing transactions, such as the requirements articulated in Rev. Proc. 75-21, 1975-1 C.B. 715, and Rev. Proc. 75-28, 1975-1 C.B. 752.

By letter dated December 29, 1999, Winston & Strawn provided Deloitte with a list of "appraisal conclusions we anticipate will be necessary to support our tax opinion issued in connection with any leasing transaction entered into by ComEd [Unicom's subsidiary]." That list was later reproduced almost verbatim in Deloitte appraisal reports. The following table shows side by side some of the

conclusions from the Winston & Strawn letter and conclusions appearing in the

Deloitte appraisal reports.[6]

| Winston & Strawn Letter | Spruce Appraisal Report (Deloitte) |
|---|---|
| 6) as of the Closing Date, it is reasonable to expect that the fair market value of the Leased Property will substantially exceed the applicable Early Termination Amount at all times during the Lease Term; | 6. As of the Closing Date, it is reasonable to expect that the fair market value of the Facility will substantially exceed the applicable Early Termination Amount at all times during the Lease Term; |
| 7) the Purchase Option Price is no less than 105% of the estimated "fair market value" of the Leased Property as of the expiration of the Lease term, taking into account inflation and any reasonably anticipated improvements or modifications to the Leased Property and after subtracting from such value any cost to the Lessor of acquiring possession of the Leased Property at the end of the Lease Term; | 7. The Cancellation Option Price is no less than 105% of the estimated "fair market value" of the Facility as of the expiration of the Lease Term, taking into account inflation and any reasonably anticipated improvements or modifications to the Facility and after subtracting from such value any cost to the Lessor of acquiring possession of the Facility at the end of the Lease Term; |
| 8) as of the Closing Date, the Leased Property's remaining economic useful life is __ years, and therefore the Leased Property will have a remaining economic useful life at the expiration of the maximum Service Agreement Term equal to at least 20 percent of its | 8. As of the Closing Date, the Facility's remaining economic useful life is expected to be 52 years, and therefore the Facility is expected to have a remaining economic useful life at the expiration of the maximum Service Agreement Term equal to at |

---

[6]The Scherer, Wansley, and Spruce appraisal reports prepared by Deloitte contain mostly similar boilerplate in the conclusions, with slight differences attributable to the specific terms of the transactions and fair market value figures. We use the appraisal for the Spruce station as an example to illustrate the effect of the Winston & Strawn letter on the conclusions reached by Deloitte.

| | |
|---|---|
| remaining useful life as of the Closing Date; | least 20 percent of its remaining useful life as of the Closing Date; |
| 9) the Leased Property will have a "fair market value" at the expiration of the maximum Service Agreement Term (determined without regard to inflation or deflation or any future improvements) that is equal to at least 20 percent of the current "fair market value" of the Leased Property and after subtracting from such value any cost to the Lessor of acquiring possession of the Leased Property at the end of the Lease Term; | 9. The Facility will have a fair market value at the expiration of the Lease Term of 38.4 percent of Closing Date fair market value (determined without regard to inflation or deflation or any future improvements) and a fair market value at the expiration of the maximum Service Agreement Term of 20.0 percent of Closing Date fair market value (determined without regard to inflation or deflation or any future improvements). Both uninflated residual values are at least 20 percent of the current fair market value of the Facility and after subtracting from such value any cost to the Lessor of acquiring possession of the Facility at the end of the Lease Term; |
| 12) neither the physical attributes of the Leased Property, the financial standards of the Qualified Operator or Qualified Bidder, the applicable return provisions or other terms and conditions of the Lease, Operating Agreement or Power Purchase Agreement, nor any other identifiable factor known to the Appraiser after due inquiry, will create a material inducement to Lessee to exercise the Purchase Option with respect to the Leased Property; | 13. Neither the physical attributes of the Facility, the financial standards of the Qualified Operator or Qualified Bidder, the applicable return provisions or other terms and conditions of the Lease, Operating Agreement or Power Toll Processing Agreement, nor any other identifiable factor known to the Appraiser after due inquiry, will create a material inducement to Lessee to exercise the Cancellation Option with respect to the Facility; |
| 13) based on the comparative costs of the reasonably anticipated alternatives | 14. Based on the comparative costs of the reasonably anticipated alternatives |

| | |
|---|---|
| expected to be available to Lessee at the expiration of the Lease Term, Lessee will not be under any economic compulsion to exercise the Purchase Option; | expected to be available to Lessee at the expiration of the Lease Term, Lessee will not be under any economic compulsion to exercise the Cancellation Option; |
| 17) the fixed net return required under the Service Agreement Option is less than 90% of the expected "fair market value" of such payments so that the Service Agreement Option does not create an economic compulsion for the Lessee to exercise the Purchase Option and it is expected that the Lessor will not exercise the Service Agreement Option; | 18. The fixed net return required under the Service Agreement Option is less than 95 percent of the expected "fair rental value" so that the Service Agreement Option does not create an economic compulsion for the Lessee to exercise the Cancellation Option and it is expected that the Lessor will not exercise the Service Agreement Option; |

Winston & Strawn provided continuous and substantial feedback to Deloitte on the drafts of the appraisal reports. Although Winston & Strawn did not give Deloitte directions as to the specific fair market value for each replacement property, Deloitte knew from its previous work on appraising Unicom's plants sold under the EME agreement how much gain Unicom was looking to defer.

With respect to all three replacement properties, Deloitte discussed the results obtained under three standard valuation approaches: cost of replacement approach, market approach, and discounted cashflow approach. Deloitte concluded that the discounted cashflow analysis represented the most reliable

approach to determining the current fair market value of the assets in the test transactions in all of the cases.[7]

To arrive at the fair market values of the replacement plants at the end of the sublease terms, Deloitte used the maximum Federal statutory corporate income tax rate of 35% and a State corporate income tax rate of 9% (total of 40.85%) even though the plants were in Texas, which did not have a State corporate income tax, and in Georgia, which had a 6% State corporate income tax rate.[8] Deloitte used the same discount rate of 10% for all three plants and assumed inflation of 2.5% per annum. Deloitte did not perform any sensitivity analysis.

For the Spruce station, Deloitte assumed the plant capacity factor to be 90.3% in 2000, declining to 58.7% in 2032 and to 49.6% in 2052. For the Wansley station, Deloitte assumed the plant capacity factor of 66.5% in 2000, declining to 39.2% in 2028 and to 32.6% in 2044. For the Scherer station, Deloitte assumed the plant capacity factor to be 66.5% in 2000, declining to 39.9%

---

[7]We note, however, that Deloitte relied mostly on the cost approach to determine the fair market value of the assets at the end of the leaseback term.

[8]At the time of Deloitte's appraisal, Texas had a corporate franchise tax equal to the greater of 0.25% of a corporation's net taxable capital or 4.5% of its net taxable earned surplus. Tex. Tax Code Ann. sec. 171.002 (West 2000). In addition to its corporate income tax, Georgia levied a graduated corporate net worth tax, ranging from $10 to $5,000. Ga. Code Ann. sec. 48-13-73 (2013).

by 2030. Deloitte did not analyze in its appraisal reports how a change in a capacity factor might influence the future fair market value of the assets at issue.

After performing the analysis, Deloitte concluded that CPS and MEAG would not be economically compelled to exercise their cancellation or purchase options at the end of their respective subleases. If based on the Deloitte analysis, the fair market value of all the replacement properties at the end of the leaseback term would be less than the cancellation or purchase option price. In arriving at this conclusion, Deloitte did not consider noneconomic factors or any arrangements between the parties setting aside the money for the option payment at the beginning of the lease.

3.      Financial and Economic Analysis

Ruth Ann Gillis, Unicom's chief financial officer in 1999-2000, coordinated the financial and economic due diligence on the Spruce, Wansley, and Scherer transactions. Ms. Gillis reviewed both the creditworthiness of CPS and MEAG and the quality of the leased stations. At the end of the due diligence process, Ms. Gillis felt comfortable recommending that the board of directors enter into the transactions.

PwC acted as a financial adviser in connection with the like-kind exchange and the sale-leaseback transactions. PwC's engagement included the following

services: (i) assessing Unicom's specific needs from economic, tax, accounting, commercial, and regulatory standpoints in connection with the proposed like-kind exchange; (ii) developing a strategy matching target replacement property with the relinquished property; (iii) identifying target replacement property owned by both tax-exempt lessees and taxable lessees; (iv) arranging for a tax and accounting analysis regarding the like-kind exchange; (v) providing economic analyses and pricing models and issuing reports regarding accounting treatment for the life of the like-kind exchange; and (vi) issuing an opinion regarding the application of accounting principles to the like-kind exchange. Subsequently, PwC also acted as the designated tax shelter organizer on behalf of Exelon and registered the transactions with the IRS as a confidential tax shelter.

Petitioner retained First Chicago Leasing Corp. (FCLC), a wholly owned subsidiary of Banc One Capital Corp. (Banc One), to serve as a supplemental investment adviser to the Unicom Group. FCLC provided Unicom with financial and risk analysis of, and advice relating to, the like-kind exchange. FCLC considered all material credit risks as having been adequately addressed through the transaction structure and financial enhancements such that the transactions at issue possessed above-average safety from a credit risk perspective with respect to payment of scheduled rent, purchase options, or early termination damage claims,

thus protecting Unicom's investment return.  FCLC advised that CPS and MEAG were generally very credit-worthy, strong, investment-grade entities and would remain primarily liable for all rent and purchase option obligations.  FCLC also concluded that Unicom would not suffer losses due to failure on the part of CPS and MEAG to pay rent, sums due for purchase options, or liquidated damages at the appropriate times.

With respect to the risk of bankruptcy of CPS or MEAG, FCLC concluded that "the potential adverse effects of the real estate classification in a bankruptcy are being borne in these transactions by the credit support parties and not Unicom."  FCLC further concluded that Unicom could rely on being able to get a full payout in cash if a bankruptcy of a lessee occurred.  FCLC did not evaluate the risks related to the service contract period after the expiration of the sublease to CPS or MEAG.

Marsh USA, Inc., advised Unicom on standard insurance practices for the U.S. utility industry and the appropriate terms for property damage and commercial liability insurance in the Spruce, Wansley, and Scherer transactions.

4.     Legal and Tax Analysis

Winston & Strawn analyzed the qualification of the replacement properties against the relevant tax tests for like-kind exchanges, helped negotiate the

transactions with CPS and MEAG, drafted the various transaction documents, and analyzed the tax consequences thereof.  Winston & Strawn also analyzed the relevant leasing authorities and legal risks associated with the Spruce, Wansley, and Scherer transactions.  Winston & Strawn worked with local legal counsel in Illinois, Georgia, and Texas to assist with regulatory, corporate, real estate and title, and engineering and surveying issues with respect to the Spruce, Wansley, and Scherer stations.

Winston & Strawn was closely involved in the due diligence process, including marking up the engagement agreement with Deloitte and, as previously discussed, providing Deloitte with a list of desirable conclusions and comments on the appraisal report drafts.

Winston & Strawn provided two tax opinion packages containing opinion letters and supporting memoranda to Unicom, dated as of the closing of the sale-leaseback transactions, on the Federal income tax treatment of the transactions. The opinion package for the exchange of the Collins station for Spruce totaled 357 pages, while the opinion package for the exchange of the Powerton station for Wansley and Scherer was 392 pages.  Winston & Strawn's primary tax opinions concluded the following.

(a)  The exchange of Unicom's fossil fuel power generating facilities in Illinois with the lessees' fossil fuel power generating facilities "should be treated as a valid exchange of like kind or like class property under section 1031 of the Code."

(b)  Each of the Spruce, Wansley, and Scherer leases "will be treated as a true lease for federal income tax purposes pursuant to which UII [Unicom] will directly or indirectly receive the taxable income and deductions associated with the ownership of" the Spruce, Wansley, and Scherer stations, respectively.

(c)  Substantially all of the section 467 rental payments "will be treated" as loans to Unicom "rather than as current rental income."

(d)  The Spruce, Wansley, and Scherer leases "will transfer ownership" of the Spruce, Wansley, and Scherer stations to Unicom for Federal income tax purposes.

Although Winston & Strawn provided generally favorable opinions, it separately warned Unicom that there are certain risks related to Federal tax law, including recent guidance by the Internal Revenue Service on lease-in/lease-out (LILO) transactions and the possibility that the proposed transaction might be subsequently classified as a corporate tax shelter.

Unicom retained Vinson & Elkins LLP to provide legal advice and opinion as to Texas law relevant to the Spruce transaction. Unicom retained Holland & Knight LLP to provide legal advice and opinion as to Georgia law relevant to the Scherer and Wansley transactions.

With respect to the review by Unicom's own employees of the analysis and conclusions provided in the Winston & Strawn legal opinions, Mr. Roling testified that he did not get beyond the first seven of several hundred pages of the opinion,[9] and Unicom's internal tax personnel also did not review the legal analysis in the draft opinions. Mr. Berdelle, however, testified that he did read the Winston & Strawn tax opinions in their entirety.

C.     Board Approval

At the March 9, 2000, Unicom board meeting, John Rowe, Chief Executive Officer and Chairman of ComEd and Unicom, introduced a discussion of the proposed like-kind exchange, and Mr. Berdelle presented information to the board

---

[9]Mr. Roling testified that he read seven pages of an opinion, but it is not apparent to which opinion he referred. The record shows that Winston & Strawn provided two tax opinion packages, in addition to drafts throughout the preparatory stages of the transactions. However, in certain places, the record indicates that an employee of petitioner reviewed an "opinion", in the singular. Here and elsewhere in our Opinion, we use the singular and the plural forms of the word as appropriate to reflect whichever grammatical number the record establishes on that particular point.

on the like-kind exchange and the sale-leaseback proposal as it had developed since the December 1999 board meeting. On March 28, 2000, the board received a memorandum explaining the nature of the transactions and a credit and investment analysis, as well as expected economic results.

On April 4, 2000, Mr. Berdelle presented the proposed like-kind exchange to the board in more detail, and representatives of the Winston & Strawn team and Mr. Jenkins from PwC responded to the board's questions about the credit risks, the tax risks, and the financial returns associated with the transaction. Mr. Rowe, Mr. Berdelle, and Ms. Gillis all recommended that the board approve the like-kind exchange, and the board followed their advice.

At the time the transactions were approved, some results of the due diligence, including legal opinions, valuation reports, and engineering due diligence reports, were not yet available in their final form. It is unknown whether the board reviewed the draft reports and opinions, but the board memorandum dated March 28, 2000, discussed some tax and legal risks.[10]

---

[10]Specifically, appendix D discussed the risks related to the MEAG transaction, and appendix E discussed the risks related to the CPS transaction. On the risks related to a MEAG bankruptcy, the conclusion was that the risk was mitigated by MEAG's inability to become a debtor under current Georgia law. On the risks related to a CPS bankruptcy, it was considered to be an "unlikely event" mitigated by the credit enhancement.

Test Transactions

I.      Spruce

        A.      CPS and Its Decision To Enter Into the Spruce Transaction

        CPS is a municipal gas and electric utility owned by the City of San

Antonio, Texas, that sells gas and electricity to its customers.  CPS' mission

statement obligates CPS to provide low-cost, reliable gas and electricity service to

its customers.  As an entity owned by a municipality, CPS is tax exempt.

        In the late 1990s CPS' electric system served a territory consisting of

substantially all of Bexar County, Texas, and small portions of seven adjacent

counties.  The CPS system was within the Electric Reliability Council of Texas

(ERCOT) region, which was entirely within the State of Texas and served about

85% of Texas' electrical load.  ERCOT includes approximately 500 power plants.

ERCOT is not connected to the national grid, and, as a result, Texas power

producers are not subject to FERC regulations.

        CPS owned 15 electric generating units and a 28% interest in the South

Texas Project's two nuclear generating units.  The Spruce station's generating

capacity was approximately 12.3% of the generating capacity of CPS' electric

system.  The electricity prices for CPS' customers in 1999 were the lowest among

the 20 largest cities in the United States and the lowest among major Texas cities.

CPS' board of trustees has five members: one director is always the mayor of the City of San Antonio, and the other four each represent one quadrant of the city. As a part of the City of San Antonio, CPS has its financial statements included in the annual financial reports of the City of San Antonio. The City of San Antonio shares in CPS' revenues, and the percentage of gross revenues to be paid over or credited to the City of San Antonio each fiscal year by CPS is determined (within the 14% limitation) by the governing body of the City of San Antonio.

CPS had been presented with other similar transaction opportunities before Unicom's proposal, but CPS rejected these prior proposals for various reasons. After receiving the proposal from Unicom and reviewing valuations and the transaction documentation, the CPS board determined that the transaction did not violate CPS' bond covenants and gave its approval for the transaction in 2000. The City Council of San Antonio also approved the Spruce transaction. A January 27, 2000, CPS presentation to the San Antonio City Council Executive Board described the Spruce transaction as a "sale of tax benefits to a taxable entity." In making the decision, CPS did not obtain an appraisal of its own and relied on the appraisal prepared by Deloitte for Unicom.

In order to proceed with the Spruce transaction, the City of San Antonio brought suit in Texas State court to obtain a declaratory judgment on the continued validity of certain covenants in its outstanding public securities issued for the purpose of financing the construction and improvement of its electric and gas systems, which included the Spruce station. The City of San Antonio represented in the petition that the encumbrance would be limited to the value of the private company's (Unicom's) "future right to obtain a possessory leasehold interest in the [f]acility (a) after the 30-year lease back to the City has expired and (b) if the City elects not to exercise its right to cancel the [headlease] after the 30-year lease back to the City has expired." In the initial draft of the petition, the City also represented that it intended to exercise the cancellation option. However, this statement was later deleted at the suggestion of Winston & Strawn and PwC, who reviewed the petition on behalf of Unicom and provided comments.

The City of San Antonio represented in its petition that it retained fee ownership in the Spruce station and retained possession and rights to operate it during the leaseback term. The City of San Antonio also represented that all the rent would be prepaid six months after the closing date on the leaseback transaction and that the City of San Antonio would make an investment that upon maturity would provide the amounts necessary to pay for the cancellation option.

The City estimated that the net present value of the rights which Unicom would acquire in the future was approximately $40 million.

B.    Key Terms of the Spruce Lease and Sublease

1.    Lease and Sublease

On June 2, 2000, the City of San Antonio, acting by and through CPS, entered into a sale-leaseback transaction with Unicom, through UII and its wholly owned subsidiaries, Spruce Equity Holdings, L.P., and Spruce Holdings Trust, with respect to the Spruce station.  In essence, the money transferred by Unicom to CPS was to be split in three funds:  the first fund would be returned to Unicom as a prepayment of sublease by CPS, the second fund would be set aside for investment that would secure the payment of the cancellation option should CPS decide not to reacquire the Spruce station at the end of the sublease, and the third fund would be retained by CPS and could be used for its current needs.

a.    Spruce Headlease Agreement

Pursuant to the headlease agreement for the Spruce transaction (Spruce headlease), CPS leased the Spruce station to Unicom for a term of 65 years, starting June 2, 2000, and terminating on June 2, 2065 (Spruce headlease term), unless terminated earlier.  The Spruce headlease term exceeded the Spruce station's estimated remaining useful life of 52 years, as determined in the Deloitte

appraisal report dated June 2, 2000 (Spruce appraisal). Since the headlease term exceeded the plant's remaining useful life, the transaction could qualify as a sale, making it a SILO, not a LILO.

Under the Spruce headlease, Unicom agreed to pay $725 million to CPS on the closing date, June 2, 2000 (Spruce headlease rent). This amount was equal to the estimated fair market value of the Spruce station on the closing date according to the Spruce appraisal prepared by Deloitte. The appraised fair market value served as the basis for determining Unicom's investment in the transaction, and the parties did not further negotiate the investment amount. Deloitte estimated that as of the end of the Spruce sublease in 2032 the fair market value of the Spruce station would be $626 million if based on the discounted cashflow analysis ($609.6 million if based on the cost approach).

### b. Spruce Sublease Agreement

Under the Spruce sublease agreement (Spruce sublease), CPS leased back from Unicom all of Unicom's right, title, and interest in the Spruce station under the Spruce headlease. The sublease term commenced on June 2, 2000, and was scheduled to terminate on March 2, 2032, for a term of 31.75 years.

Under the Spruce sublease, CPS was obligated to prepay rent to Unicom for the entire sublease term in the amount of $557,329,539 on November 30, 2000

(Spruce base rent). The Spruce base rent accrued and was allocated annually pro rata, commencing on the first day of the sublease term. If the Spruce sublease terminated early, Unicom was required to return to CPS any unaccrued base rent.

The Spruce sublease was a net lease, requiring CPS to pay all costs and expenses in connection with the Spruce station. In addition, CPS was required to maintain insurance on the Spruce station under the terms of the sublease.

2.    Default

The parties to the Spruce transaction agreed that the Spruce headlease could not be terminated or extinguished by any circumstances of any character or for any reason, with certain limited exceptions including CPS' defaulting under the Spruce sublease terms.

The Spruce sublease provided for early termination if CPS were to default under the terms of the sublease. The events of default included, among other provisions, failure to pay the Spruce base rent, failure of any material representation or warranty made by CPS, or failure to properly maintain the Spruce station. In case there was significant damage to the Spruce station so as to render the station beyond repair, CPS could elect to either replace the Spruce station or terminate the Spruce sublease.

In any of these scenarios, Unicom had a number of remedies against CPS, including collecting the stipulated loss value of the Spruce sublease, and taking possession of the Spruce station to operate, sell, or sublease it to somebody else. The stipulated loss value was predetermined on the closing date and based on the Deloitte Spruce appraisal and was meant to ensure Unicom's return on the investment.

3.      Property Rights and Obligations

Under the Spruce headlease, Unicom had the right to use, operate, and possess the Spruce station without interference from CPS. Unicom did not have any obligations to CPS in respect of maintenance, operation, or insurance of the Spruce station under the headlease. Upon the Spruce headlease expiration, Unicom could return the Spruce station to CPS. Unicom was not obligated to make any representations or warranties with respect to the Spruce station except that it was free and clear of liens in case CPS decided to exercise its cancellation option at the end of the Spruce sublease term.

The Spruce sublease was a triple-net lease, meaning that CPS was responsible for all the costs and expenses, foreseen or unforeseen, in connection with the Spruce station, including costs of operation, maintenance, insurance, improvements and other expenses. The Spruce sublease contained a covenant of

quiet enjoyment in favor of CPS unless it defaulted under the sublease. CPS could, at its own expense, use, operate, service, repair, and maintain the property as long as it complied with the industry standards and applicable laws and did not have a material adverse effect on the Spruce station, did not result in risk of criminal liability, and did not involve any material risk of loss, forfeiture, or sale of the Spruce station. CPS was solely responsible for environmental compliance and any necessary remedial measures. CPS was also responsible for obtaining and maintaining property and liability insurance coverage meeting certain requirements set out in the Spruce sublease agreement.

Unicom's rights under the Spruce sublease were very limited. Unicom had the right to inspect the Spruce station no more than once a year. CPS was required to seek Unicom's consent with respect to proposed improvements, corporate consolidations, subleases, and assignments.

CPS had limited rights to encumber the property throughout the Spruce sublease term, and could not create any liens on the property after the Spruce sublease term expiration. Unicom, on the other hand, could incur liens on the property after the termination of the Spruce sublease, provided that CPS did not exercise its cancellation option.

CPS took the Spruce station from Unicom on an as-is basis. However, at the end of the Spruce sublease term CPS was required to return the Spruce station in good working order and meeting the predetermined minimum operational standards. For example, the Spruce Station was required to have an annual ratio of the actual net generation to the normal claimed capacity operating for 8,760 hours/year of at least 82.0%. The Spruce station was required to have the ratio of available generation to maximum generation of at least 89% and have an annual ratio of the heat energy output of not more than 10,950 Btu/kWh. These conditions applied to the return of the Spruce station at the end of the Spruce sublease term in 2032 as well.

If CPS decided to return the station to Unicom at the end of the sublease, CPS was required to arrange at its own expense for any necessary permits for Unicom to operate the Spruce station and for engineering and environmental inspections, as well as to arrange for Unicom fuel supply contracts and transmission agreements, together with other agreements necessary to operate the station. Failure to comply with these requirements would trigger a CPS default under the agreement, and Unicom could pursue its contractual remedies.

4.      Cashflows

Unicom paid $725 million to CPS under the Spruce headlease on June 2, 2000. Of that amount, CPS retained a lump sum of approximately $88 million, of which the City of San Antonio received about $12.3 million.

On the same date, CPS entered into the collateralized payment undertaking agreement (CPUA) with AIG Financial Products (Jersey), Limited (AIG-FP). Under the CPUA, CPS would pay AIG-FP a fee of $88,995,790 (undertaking fee). In exchange, AIG-FP would use the proceeds from the undertaking fee to make payments to Unicom, for the benefit of CPS, at the end of the Spruce sublease term in the amounts and on the dates specified in the CPUA. In essence, the payments matched both in timing and amount the amounts CPS would owe to Unicom upon CPS' exercise of the fixed purchase option (cancellation option) available to CPS at the end of the Spruce sublease term. The cancellation option allowed CPS to terminate the Spruce headlease at the end of the Spruce sublease term and completely regain the ownership of the station.[11]

---

[11]CPS' payment to AIG-FP of the undertaking fee was absolute, unconditional, irrevocable, and not refundable to CPS under any circumstances, including CPS' bankruptcy. CPS did not have any rights or interest in any portion of the undertaking fee, and the fee could not be subject to any lien, claim, or remedy by CPS or its creditors. After the payment, the undertaking fee ceased to be an asset of CPS and became an asset of AIG-FP.

The CPUA required AIG-FP to deliver the cash received as the undertaking fee to Wilmington Trust Co. to be held as collateral pledged primarily to Unicom until CPS paid its obligations under the various transaction agreements. In the event of an early termination of the Spruce sublease, Unicom would receive a "termination amount" under the terms of the CPUA from the undertaking fee proceeds.

As additional protection of Unicom's interest in the amounts set aside under the CPUA, American International Group, Inc. (AIG), guaranteed the obligations of AIG-FP under the CPUA. CPS also obtained a financial guaranty insurance policy from Financial Security Assurance (FSA). Specifically, the policy provided certain protections to CPS in case of its bankruptcy or in the event of CPS' default or early termination of the sublease.

Further, from the Spruce headlease rent, CPS transferred the following amounts to secure the Spruce sublease base rent due on November 30, 2000:

(1) about $327.3 million to Wilmington Trust Co. as custodian of an account that would be pledged to Unicom;

(2) about $50 million to an account pledged to AIG Financial Products Corp. to support CPS' obligations under the letter of credit reimbursement agreement;

(3) about $162 million to an account pledged to FSA to support CPS's obligations under the insurance and indemnity agreement to the Spruce sublease.[12]

C.    End of Sublease Term

1.    CPS's Cancellation Option

At the end of the Spruce sublease term, March 2, 2032, CPS would have the option of terminating the Spruce sublease and causing Unicom to terminate the Spruce headlease (cancellation option) for the price of $733,849,606. Because the entire amount of the cancellation option payment was financed through the CPUA, CPS would not have to contribute or borrow any additional cash. According to the appraisal prepared by Deloitte, the fair market value of the Spruce station on the cancellation option exercise date in 2032 would be around $626 million if based on a discounted cashflow analysis and around $609.6 million if based on a cost approach.

If CPS chose not to exercise the cancellation option, it would trigger provisions of the Spruce sublease describing conditions for returning the Spruce station to Unicom. Among other things, CPS would have to ensure that the station meet operational standards, arrange for various inspections, obtain operating

---

[12]Although the total amount set aside was roughly $539 million, some of the money was invested by the custodians in low-risk securities to provide sufficient income to cover the entire $557 million Spruce base rent.

permits for Unicom, and arrange for Unicom to enter into fuel supply contracts, transmission agreements, and other contracts with third parties necessary to operate the Spruce station. Failure to comply with these requirements would trigger a default and the right of Unicom to seek contractual remedies, as discussed below.

### 2. Unicom's Options

If CPS chose not to exercise the cancellation option at the end of the sublease term, Unicom would have three choices. First, Unicom could require CPS to arrange for a "qualified operator" to enter into an operating agreement with Unicom. Second, Unicom could require CPS to arrange for a "qualified bidder" to enter into a service agreement. If Unicom did not provide CPS with written notice of which option it decided to exercise, Unicom would be deemed to have exercised both the operating agreement and the service agreement options. Finally, Unicom could take possession of the Spruce station and could operate it and sell its energy production without exercising the operating agreement or service option.

If Unicom exercised the service agreement or operating agreement option and CPS failed to implement the service agreement or operating agreement option by the end of the Spruce sublease, such failure would constitute an event of default

and trigger the right of Unicom to pursue appropriate remedies. However, under certain circumstances CPS would have another opportunity to exercise the cancellation option at the same price.

     a.     <u>Operating Agreement</u>

Under the operating agreement option, CPS was required to find a qualified operator for the Spruce station. CPS could not be the qualified operator. A qualified operator would have to, among other requirements, have its senior long-term debt rated no lower than Aa2 by Moody's and AA by S&P or have a comparable rating by another rating agency acceptable to Unicom or be deemed similarly creditworthy in the sole opinion of Unicom. Alternatively, a qualified operator could obtain a guaranty of its obligations under the operating agreement by any person with its senior unsecured long-term debt rated no lower than Aa2 by Moody's and AA by S&P, or have a comparable rating by another rating agency acceptable to Unicom.

The operating agreement option contemplated that the electric output of the Spruce station would be sold to third parties under the power toll processing agreements, discussed in the next section.

Deloitte included in its appraisal a list of potential power purchasers and operators. The only entity with an acceptable credit rating was General Electric

Corp., meaning that most potential qualified operators would have to make guaranty arrangements.

### 3. Service Agreement

If CPS did not elect to exercise its cancellation option and Unicom elected to exercise the service agreement option, CPS was required to arrange for the submission of one or more bids from qualified bidders to enter into the power toll processing agreement with Unicom for a term of 9.58 years. Unicom expected the power toll processing agreement to be substantially in the form attached to the Spruce sublease agreement. CPS was also required to arrange for the qualified bidder to satisfy all of the conditions precedent to entering into the power toll processing agreement on or before the expiration date for the Spruce sublease.

A qualified bidder would have to have--or have its obligations under the power toll processing agreement guaranteed by any person that had--senior unsecured long-term debt obligations rated no lower than Aa2 by Moody's and AA by S&P or have a comparable rating for its senior unsecured long-term debt obligations by another rating agency acceptable to Unicom. If a bidder or a guarantor did not have debt with such a rating, Unicom could determine whether the bidder or guarantor satisfied the creditworthiness requirements at its sole discretion.

The power purchase bids would have to provide Unicom with net power revenue in the amounts and at the times set forth in the Spruce sublease. Unicom could reject any bid if it concluded that the bid would require the Spruce station to be operated inconsistently with the standards and operational practices and policies of operators of similar facilities in similar circumstances. In that event, CPS would be entitled to arrange for one or more alternative bids. If CPS were unable to find a qualified bidder or Unicom rejected all bidders on or before the Spruce sublease expiration date, CPS would have to exercise the cancellation option.

II.     Scherer and Wansley

    A.     MEAG and Its Decision To Enter the Scherer and Wansley Transactions

MEAG was created by the State of Georgia to own and operate electric generation and transmission facilities and supply bulk wholesale electric power to its 49 member municipalities, 48 cities, and one county in Georgia. MEAG's mission is to deliver low-cost power to its participants and, with respect to its own generation plants, operate them at the lowest cost. MEAG sells power to its cities at cost and any profit it earns has to inure to the benefit of its cities.

MEAG is a member of a power marketing agency called the Energy Authority, which optimizes MEAG's resources and identifies the most economical method for MEAG to supply power to its members. These options could entail selling output to the market from one of the power plants MEAG owns and then buying lower-cost power from a third party, or selling some of MEAG's extra capacity during colder months to Florida, North Carolina, or Alabama.

MEAG's portfolio of assets consists primarily of investments in power plants, including undivided ownership interests in the Scherer and Wansley stations.[13] Typically, MEAG issues debt to finance the construction of a power plant, capitalizing the interest during the construction, and then bills cities monthly for the debt service, the operating expenses, and the fuel expenses.

MEAG is a governmental entity and is tax exempt. State law restricts MEAG's investments primarily to U.S. Treasuries, repurchase agreements backed by treasuries and agencies, and money market funds that have treasuries and agencies. In 1999 MEAG opened an account with $435 million that was intended to grow with interest until 2008 when MEAG thought deregulation would occur, but the power market in Georgia was never deregulated.

---

[13] Georgia Power Co., Oglethorpe Power Corp., and the City of Dalton are the coowners of the Scherer and Wansley Stations. Georgia Power Corp. operates the Scherer and Wansley Stations.

James Fuller was MEAG's treasurer at the time the Wansley and Scherer transactions were negotiated and closed. Mr. Fuller led MEAG in the negotiations with petitioner and the other third parties involved in the transactions. During the negotiations, Mr. Fuller reviewed the transaction documents and the terms relating to the fixed price purchase option. Mr. Fuller also reviewed the Deloitte appraisal, but MEAG did not do an appraisal of its own. MEAG originally acquired the Wansley and Scherer stations at cost.

Before entering into the Scherer and Wansley transactions, MEAG obtained certain consents from the coowners of the stations, Georgia Power Co., Oglethorpe Power Corp., and the City of Dalton. MEAG also retained R.W. Beck to evaluate the impact of the sale of these plants on MEAG's participants to comply with the provisions of the bond indentures issued to finance the Wansley and Scherer stations.

B.     Key Terms of the Scherer Transaction

Plant Robert W. Scherer Unit Nos. 1 and 2 (Scherer station) is on a 12,000-acre site near Forsythe, Georgia, and includes a powerhouse containing Units 1 through 4, various ash ponds, a water pond, a coal storage yard, a 550-kilovolt substation, and a man-made lake. Only Units 1 and 2 of the Scherer station were part of the leasing transactions with Unicom. The leased property did not include

the coal stockpile, inventories, intangibles, and unit trains owned by MEAG at the sites. Units 1 and 2 of the Scherer station are conventional coal-fired units equipped with a single boiler and turbine generator, commissioned in 1982 and 1984, respectively.

### 1. Lease and Sublease

On June 9, 2000, Unicom, acting through Scherer Holdings 1, LLC, and UII, entered into a sale-leaseback transaction with MEAG involving an undivided interest in the Scherer station (Scherer transaction).

### a. Headlease

Pursuant to the headlease agreement for the Scherer transaction (Scherer headlease), MEAG leased to Unicom (i) a 10.0% undivided interest in the Unit 1 site, the Unit 2 site and the unit common facilities site, and a 5.0% undivided interest in the Plant Scherer Common Facilities Site, (ii) a 10.0% undivided interest in Unit , Unit 2, and the unit common facilities, and (iii) a 5.0% undivided interest in the Plant 27 Scherer Common Facilities (collectively, Scherer station) for a term of 61.75 years, starting June 9, 2000 and terminating on September 9, 2061 (Scherer headlease term), unless terminated earlier. The Scherer headlease term exceeded the Scherer station's estimated remaining useful life of 49 years, as

determined in an appraisal report on the Scherer Station dated June 9, 2000, prepared by Deloitte (Scherer appraisal).

Under the Scherer headlease, Unicom agreed to pay MEAG $201,986,755 on the closing date, June 9, 2000 (Scherer headlease rent). The Scherer headlease rent equaled the estimated fair market value of the Scherer station as of June 9, 2000, as determined by Deloitte in the Scherer appraisal. The parties did not further negotiate the fair market value of the station, and Mr. Fuller could not recall whether MEAG had obtained written advice on the valuation of the Scherer station from anyone other than Deloitte.

MEAG had the right to inspect the Scherer station site throughout the duration of the headlease. Unicom did not have any obligations to MEAG as to maintenance, operation, or insurance of the interests conveyed under the headlease.

   b. <u>Sublease</u>

On the same date, June 9, 2000, Unicom and MEAG entered into an agreement to lease back the Scherer station (Scherer sublease). MEAG leased back from Unicom all of Unicom's right, title, and interest in the Scherer station under the Scherer headlease. The sublease term commenced on June 9, 2000, and

was scheduled to terminate on September 9, 2030, for a total term of 30.25 years (Scherer sublease term).

MEAG had an absolute and unconditional obligation to prepay Scherer sublease rent of $157,414,216 to Unicom on December 7, 2000. Similar to the Spruce transaction, the Scherer sublease was a triple net lease, meaning that MEAG was solely responsible for any expenses associated with the sublease. The parties allocated all the risks related to the Scherer sublease to MEAG. MEAG was also responsible for maintaining property and liability insurance which met the requirements set forth in the Scherer sublease.

### 2. Default

Similarly to the Spruce transaction, MEAG and CPS could not declare a default under the headlease. The Scherer sublease, however, had provisions outlining what events would constitute a default by MEAG. Such events included, among others, MEAG's failure to pay the Scherer sublease rent on time, failure of material representation or warranty, or failure to properly maintain the Scherer station. MEAG had an opportunity to cure such defaults.

In addition, the Scherer sublease also specified certain "Events of Loss", in case of which MEAG could elect to either rebuild or replace the specific unit in question or to terminate the sublease with respect to that unit.

In the event of default, Unicom had the following contractual remedies: (1) enforce performance by MEAG at MEAG's cost or recover damages for a breach; (2) terminate the Scherer sublease and demand that MEAG return possession of the subleased assets to Unicom; or (3) demand that MEAG pay any supplemental sublease rent due plus the stipulated loss value, and, upon such payment, transfer all of its right, title, and interest in the leased assets back to MEAG. If Unicom chose to proceed with the second or third option, it was required to return unaccrued rent in the form of an early termination amount, as determined on schedule 2 of the Scherer sublease agreement. If Unicom chose to proceed with the second option, MEAG would still have an option to purchase the undivided interest in the Scherer station at a price equal to the higher of stipulated loss value as of the date of sublease termination due to a default or the then fair market sale value.

If an event of loss occurred and MEAG chose not to rebuild or replace a specific unit, MEAG would have to pay Unicom a stipulated loss value, as set forth in schedule 2 to the Scherer sublease agreement. Unicom would then have to pay to MEAG an early termination amount, which would reflect any unaccrued rent as of the date of the event of loss.

3.      Property Rights and Obligations

Unlike the Spruce transaction, where Unicom received a 100% interest in the Spruce station, the Scherer headlease transferred only a partial interest in the Scherer station to Unicom.  Unicom received a right of quiet enjoyment under the headlease.  This, however, did not result in Unicom's authority to operate the Scherer station.[14]  Unicom had the right to use the ground interest to construct, install, operate, use, repair, and relocate and remove facilities and structures on or under the Scherer site.  Unicom, however, in general did not have any obligations to MEAG with respect to maintenance, operation, or insurance of the Scherer station interest under the headlease.

Upon the expiration of the Spruce headlease, Unicom was to return its interest to MEAG on the "as is" and "with all faults" basis.  MEAG had the right to inspect the property after the expiration of the leaseback term.  Unicom was responsible for a percentage of certain taxes and assessments with respect to the ground interest described in the Scherer headlease agreement from the date the leaseback to MEAG ended and until the end of the headlease.  Both MEAG and

---

[14]Operation of the Scherer station was governed by the agreement among MEAG, Georgia Power Co., Oglethorpe Power Corp., and the City of Dalton.  At the time Unicom and MEAG entered into the sale-leaseback arrangements, Georgia Power Co. operated both the Scherer and Wansley stations.

Unicom agreed to limit their ability to incur liens with respect to the Scherer station interest transferred by the Scherer headlease.

Under the Scherer sublease, MEAG received the same interest in the Scherer station it transferred to Unicom under the Scherer headlease. Overall, the rights of MEAG under the sublease were similar to the rights of CPS under the Spruce sublease. MEAG's rights with respect to subleasing its interest during the sublease term were broader than those of CPS: MEAG did not need separate approval for a sublease if it met certain requirements. Unicom had the right to inspect the premises during the sublease once a year and the right to consent to the assignment by MEAG of its rights under the Scherer sublease.

Under the Scherer sublease, MEAG took the Scherer station interest from Unicom on an as-is basis. If MEAG or other tenants in common of the Scherer station did not exercise the purchase option at the end of the Scherer sublease or if MEAG was required to return the Scherer station interest to Unicom after a default, MEAG was required to meet certain conditions, including having the Scherer station meet certain operational standards and be free from major defects, in good working order, and in a good state of repair. Unicom was entitled to receive, and MEAG agreed to deliver, the Scherer station with at least a 62% capacity factor based on 8,760 hours of operation per year and net energy output

of 87.5%. In addition, MEAG was required to be in compliance with other agreements governing ownership and operation of the Scherer station and have no outstanding amounts due under those contracts.

If MEAG were required to return the Scherer station interest to Unicom, and Unicom chose the service agreement option, MEAG was to arrange at its own expense for any necessary permits for Unicom or a qualified bidder under the service agreement to operate the Scherer station. MEAG was also required to arrange for an environmental inspection, as well as to arrange for Unicom fuel supply contracts and transmission agreements, together with any other agreements necessary to operate the station. Failure to comply with the prerequisites to returning the Scherer station interest would trigger for MEAG, under certain circumstances, the requirement to pay to Unicom an amount equal to the diminution in the fair market sale value of the interest caused by MEAG's failure to comply with the return conditions.

4.    Cashflows and Collateral Agreements

Unicom and MEAG chose to structure the cashflows for the Scherer and Wansley transactions differently from those for the Spruce transaction. In part this was so because of MEAG's limited authority to invest in securities.

Pursuant to the Scherer headlease, on June 9, 2000, Unicom paid the Scherer headlease rent of $201,986,755 to MEAG.

On June 9, 2000, MEAG entered into the Government securities pledge agreement (Scherer pledge agreement) with Ambac Credit Products, LLC (Ambac Credit), and State Street, as agent and intermediary. Pursuant to the Scherer pledge agreement, MEAG would pay from the Scherer headlease rent $152,228,894 to State Street to purchase Government securities on the closing date of the Scherer transaction. The pledge agreement required MEAG to pledge these Government securities to Ambac Credit first and Unicom second to secure MEAG's obligation under the Scherer sublease to make the Scherer base rent payment on December 7, 2000.

State Street also paid Ambac Credit $1,544,674 on the closing date of the Scherer 1 transaction on behalf of MEAG. In exchange, Ambac Credit agreed to make certain payments on behalf of MEAG pursuant to a credit swap agreement between Ambac Credit and UII (UII swap agreement). The payment also covered the financial guaranty insurance policy issued by Ambac Assurance Corp., No. SF0353BE, dated June 9, 2000 (Scherer FGIP).

Under the UII swap agreement, Ambac Credit was obligated to pay UII the excess of the stipulated loss value over all payments UII received with respect to

the stipulated loss value or purchase option price from other sources, plus the early termination amount. In exchange, UII would be required to surrender its right, title, and interest under the Wansley transaction to Ambac Credit, the swap provider.

Under the Scherer FGIP, Ambac Assurance Corp. unconditionally and irrevocably guaranteed the payments by the swap provider under the UII swap agreement. The payment obligation under the UII swap agreement is triggered by the occurrence of any of several events, including MEAG's failure to pay the base rent or the stipulated loss value, certain misrepresentations by MEAG, MEAG's insolvency or bankruptcy, and MEAG's failure to perform or observe the covenants and obligations under the Wansley transaction documents.

On June 9, 2000, MEAG entered into a credit swap agreement with Ambac Credit (MEAG swap agreement). Ambac Credit paid MEAG $372,890, and MEAG agreed to make the payments described in the MEAG swap agreement. MEAG's payment obligations under the MEAG swap agreement are the same as those described under the UII swap agreement. State Street paid $1,000,934 of various transaction expenses on the closing date of the Scherer transaction on behalf of MEAG.

On June 9, 2000, MEAG also transferred $47,576,143 to various collateral accounts for investment in short-term collateralized flex repurchase agreements. The collateral accounts served as collateral for MEAG's purchase option obligation under the Scherer sublease.

The effect of the transactions discussed above was to set aside funds from the Scherer headlease rent to fund MEAG's obligations to pay the Scherer rent and the purchase option under the Scherer sublease.

5.      End of Sublease Term

Similarly to the Spruce transaction, at the end of the sublease term MEAG or one of its cotenants in common could exercise the purchase option to regain all the rights to the Scherer station.  If that did not happen, Unicom could exercise its rights under the operating agreement or service agreement option, or could choose to purchase and sell its share of the Scherer output on the market.[15]

a.      MEAG's Purchase Option

At the end of the Scherer sublease term, September 9, 2030, MEAG has the option of terminating the Scherer sublease and causing Unicom to terminate the Scherer headlease for the price of $179,284,424 (Scherer purchase option).  If

---

[15]As discussed supra note 14, Unicom's authority to operate the Scherer station was limited, so we do not consider it as a viable possibility in our analysis.

MEAG chooses not to exercise the Scherer purchase option, one or more of MEAG's cotenants in common will then have the right to acquire Unicom's interest in the Scherer station.[16]  To exercise the Scherer purchase option, MEAG will have to give written notice to Unicom no later than January 15, 2029.

If neither MEAG nor its cotenants in common decide to exercise the Scherer purchase option, MEAG will have to comply with all of the requirements for returning the Scherer station interest to Unicom as described above.

### b.      Unicom's Options

### i.      Operating Agreement Option

Under the terms of the Scherer sublease, if neither MEAG nor its cotenants exercise their purchase options, Unicom can exercise the operating agreement option.  This option will not be available to Unicom if, at the time of exercise, MEAG is not an operator of the Scherer station under the agreements governing MEAG's relationships with cotenants and management and operation of the Scherer station.

If MEAG is an operator of the Scherer station, Unicom can then require MEAG to arrange for a qualified third party to enter into an operating agreement

---

[16]Georgia Power Co., Oglethorpe Power Corp., and the City of Dalton all had the right to exercise the purchase option for the undivided interest in the Scherer station if MEAG chose not to.

with Unicom to operate the Scherer station. The electric output of the Scherer station would be sold to third parties under power purchase agreements while the station was operated and maintained on behalf of Unicom by the qualified operator.

A qualified operator would, among other requirements, have, or have its obligations guaranteed by a guarantor who has, a rating not lower than Aa2 by Moody's and AA by S&P, or be deemed similarly creditworthy by Unicom and be otherwise reasonably acceptable to Unicom. Failure by MEAG to implement its obligations under the operation agreement option would lead to MEAG's default under the Scherer sublease. Under certain circumstances, MEAG and its cotenants would get another opportunity to exercise the purchase option. If they decided not to do so, Unicom would have to use other remedies available to it under the Scherer sublease.

### ii.    Service Agreement Option

If MEAG or its cotenants chose not to exercise the purchase option and MEAG was not an operator of the Scherer station at that time, the only option available to Unicom would be to exercise its rights under the service agreement option.

Under the service agreement option, Unicom could require MEAG to arrange for the submission of one or more power purchase bids from "qualified bidders" to enter into power purchase agreements with Unicom.

Similarly to the Spruce transaction, a qualified bidder would have to meet certain creditworthiness requirements or have its obligations under the power purchase agreement guaranteed by an entity with sufficient creditworthiness. MEAG could itself submit a bid as a qualified bidder subject to meeting all the qualified bidder requirements. The parties contemplated that a qualified bidder would enter into a power purchase agreement and would purchase the electric output from the Scherer station for the term of 8.69 years. On the basis of the Deloitte appraisal, the parties believed that after the end of the power purchase agreement term, the remaining economic useful life of the assets under the Scherer headlease would be 10.6 years or 20.53% of the estimated overall useful life remaining as of the closing date in 2000.

The requirements for the net power revenue under the power purchase agreement to be received by Unicom were predetermined and set out as schedules to the Scherer sublease. However, these payments were not guaranteed unless the plant actually produced power in the required amounts and at certain efficiency standards.

Unicom could reject any bids at its sole discretion. If MEAG failed to provide Unicom with qualified bidders to enter into the power purchase agreement or if Unicom rejected all such bids, that would constitute an event of default under the agreement. Under certain circumstances, MEAG would have an additional opportunity to exercise the purchase option. Otherwise, Unicom could use the standard remedies available under the provisions governing events of default.

Similar to the Spruce sublease, if Unicom did not give notice as to which option it elected, it would be deemed to have elected to exercise both the operating agreement and the service agreement options if both options are available. MEAG's failure to implement its obligations under both options would constitute its default under the sublease, which would result in either another chance to exercise the purchase option or Unicom's entitlement to other contractual remedies.

C. Key Terms of the Wansley Transaction

Power Plant Wansley (Wansley station), on a 5,225-acre site near Carrollton, Georgia, included two conventional power generation units, as well as a 320-acre ash disposal pond, a 126-acre potable water pond, a 40-acre coal storage yard, a 15-acre 500-kilovolt substation, and a 606-acre service water pond that provides cooling water for the plant. At the time of the transaction in 2000,

Wansley station comprised two self-contained 865 MW coal-fired units. Units 1 and 2 are conventional coal-fired units equipped with a single boiler and turbine generator, commissioned in 1982 and 1984, respectively. The leased property did not include the coal stockpile, inventories, intangibles, and unit trains owned by MEAG at the sites.

1. Lease and Sublease

a. Headlease

On June 9, 2000, MEAG entered into the Wansley transaction with Unicom (through Wansley Holdings 1, LLC and UII) involving an undivided interest in Plant Hal Wansley Units 1 and 2 (together, Wansley station), as well as certain common facilities. In the Wansley transaction, MEAG leased a 10% undivided interest in the Wansley station[17] to Unicom through its wholly owned subsidiaries for a term of 56.75 years (Wansley headlease). Deloitte appraised the undivided interest in the Wansley station as of the closing date of June 9, 2000, at $172 million. Deloitte determined that the Wansley headlease term of 56.75 years exceeds the Wansley station's estimated remaining useful life of 45 years.

_____

[17]For the sake of clarity, references in this Opinion to the lease or sublease of the Wansley station are to be understood as referring to a lease or sublease of the 10% undivided interest in the Wansley station.

On June 9, 2000, under the Wansley headlease, Unicom paid $172,185,430 to MEAG for the lease of the Wansley station (Wansley headlease rent). According to Deloitte, the Wansley headlease rent was approximately equal to the estimated fair market value of the Wansley station on June 9, 2000. The appraised fair market value served as the basis for determining Unicom's investment in the transactions, and the parties did not further negotiate the investment amount. Deloitte estimated that as of the end of the sublease the fair market value of the Wansley station would be about $485 million if based on the discounted cashflow approach and $481 million if based on the cost approach.[18]

b.    Sublease

On June 9, 2000, MEAG and Unicom, through Wansley Holdings 1, LLC, entered into the sublease agreement, whereby MEAG leased the Wansley Station back (Wansley sublease) from Unicom for a term of 27.75 years. MEAG leased back from Unicom all of Unicom's rights, title, and interest in the Wansley station. The Wansley sublease was scheduled to terminate on March 9, 2028. Under the terms of the Wansley sublease, MEAG was obligated to pay rent to Unicom of

---

[18]The Wansley appraisal prepared by Deloitte did not allocate the values between Wansley 1 and 2.

$134,087,903, on December 7, 2000, six months after the closing of the Wansley transaction (Wansley base rent).

The Wansley sublease was a net lease, similar to the Spruce and Scherer subleases. MEAG was responsible for all costs and expenses associated with the Wansley station throughout the sublease. In addition, MEAG had to maintain property and liability insurance on the Wansley station meeting the requirements set out in the sublease.

2.    Default

Provisions governing events of default and events of loss are substantially the same in the Wansley and Scherer transactions. The Wansley sublease outlines different operating standards that the station must meet if it is returned to Unicom in an event of default, but other conditions are either very similar or the same.

3.    Property Rights

The property rights of Unicom and MEAG under the Wansley transaction are substantially identical to those in the Scherer transaction and need not be separately stated here.

4.    Cashflows and Collateral Agreements

MEAG and Unicom used the same structure of cashflows and collateral agreements for the Wansley transaction as for the Scherer transaction.

Pursuant to the Wansley headlease, on June 9, 2000, Unicom paid the Wansley headlease rent of $172,185,430 to MEAG.

On June 9, 2000, MEAG entered into the Government securities pledge agreement with Ambac Credit and State Street as agent and intermediary. MEAG paid State Street $129,768,893 from the Wansley headlease rent to purchase Government securities on that same date. MEAG pledged the Government securities to Ambac Credit and Unicom to secure MEAG's obligation to pay the base rent under the Wansley sublease on December 7, 2000. It was projected that the Government securities would equal the Wansley base rent of $134,087,903.

On June 9, 2000, MEAG provided UII with the UII swap agreement and the financial guaranty insurance policy issued by Ambac Assurance Corp., No. SF0356BE, dated June 9, 2000 (Wansley FGIP). On the same date, State Street, on behalf of MEAG, paid Ambac Credit $1,200,317.76, in consideration of Ambac Credit's agreement to make the payments described in the UII swap agreement and in the Wansley FGIP. The obligations of the parties are the same as under the UII swap agreement and the Wansley FGIP in the Scherer transaction.

On June 9, 2000, MEAG entered into the MEAG swap agreement with Ambac Credit, and Ambac Credit paid MEAG $287,226 in consideration of MEAG's agreement to make the payments described in the credit swap between

MEAG and Ambac Credit. MEAG's payment obligations under the MEAG swap agreement are the same as those described under the UII swap agreement. On behalf of MEAG, State Street Bank also paid $860,927 of transaction expenses on the closing date.

Also on the closing date, MEAG transferred $40,642,518 to collateral accounts for investment in short term collateralized flex repurchase agreements, as collateral for the purchase option, with a pledge first to Ambac Credit and second to UII.

### 5. End of Sublease Term

The end of sublease term options for Unicom and MEAG regarding the Wansley station are substantially the same as those in the Scherer transaction. MEAG and Georgia Power Co. could exercise the purchase option at the end of the Wansley sublease. The purchase option price was set at $143,543,915. If they chose not to do so, Unicom would be able to proceed with the operating agreement and service agreement options, similar to the provisions in the Scherer transactions. Alternatively, Unicom could get its share of the Wansley station output and sell it on the market.

Under the service agreement option, the electric output from the Wansley station would be purchased by third parties for the term of 8.09 years, and after the

end of the power purchase agreement term the parties projected the remaining economic useful life of the Wansley station to be 9.17 years, or 20.38% of the estimated overall useful life remaining as of the closing date in 2000.

D.    MEAG's Net Present Value Benefit

MEAG was entitled to receive a payment of approximately $110 million for its participation in the Scherer and Wansley transactions (MEAG NPV benefit). Mr. Fuller informed MEAG's board of directors in June 2000 that the MEAG NPV benefit for entering into the transactions would be approximately 11.19% of the value of each lease in the Wansley station and 12.34% of the value of each lease in the Scherer station. MEAG placed the NPV benefit into a trust account with State Street until 2014, at which time MEAG was expected to transfer the funds to the municipal competitive trust. MEAG's rights to use the NPV benefit until then were limited under the corresponding agreements because the trust account was pledged to lower the cost of insurance of the transactions and to secure the payment of early termination fees.

## Post-Closing Events

I.    Construction of Spruce II

At the time that CPS built the Spruce station, CPS had also intended to build, on an unspecified future date, a second generating plant (Spruce II) on the

same site as the Spruce station.  The Spruce transaction documents reflected the existence of such plans but in terms that did not convey absolute certainty.

On June 16, 2004, CPS informed Unicom in writing of CPS' intention to exercise its right to install and use additional facilities on the site of the Spruce station.  CPS intended for this expansion--Spruce II--to share facilities with the Spruce station, such as a "control room", a "computer room", "coal conveyers", a "demineralizer", a "limestone silo ball mill", and a "limestone slurry storage tank".  Although CPS would also build other operational facilities strictly for the benefit of Spruce II's operations, those facilities would be situated on the same land occupied by the Spruce station.

The letter dated June 16, 2004, from CPS requested prior written approval of the Spruce II construction from Unicom under the terms of the Spruce headlease.  In evaluating CPS' request, Thomas Miller, Exelon's vice president of finance, and Randy Specht, from petitioner's engineering group, visited the Spruce site on December 17, 2004.  Messrs. Miller and Specht met with CPS' plant personnel and toured the facility.  In addition to the tour, Mr. Miller requested written representations from CPS that the Spruce II station would not interfere with or harm petitioner's interest in the Spruce station.  CPS provided such written representations.  Exelon, which at the time became a successor to Unicom by

virtue of merger, then executed an approval authorizing the construction of the Spruce II plant. Exelon did not visit the site after the Spruce II project was completed in 2010 to examine the outcome.

II.   Registration of the Test Transactions as Corporate Tax Shelters

On or about April 5, 2000, before the closing of the test transactions, Winston & Strawn circulated the initial draft of a designation agreement whereby PwC as designated organizer agreed to register the Spruce, Scherer, and Wansley transactions as tax shelters with the IRS in accordance with section 6011 and applicable regulations. On May 2, 2000, PwC informed the parties involved in the test transactions that the transactions would be registered as confidential corporate tax shelters pursuant to section 6111(d) and applicable regulations and provided the parties with the proposed designation agreement which, upon execution, would appoint PwC as a designated organizer. On or about June 9, 2000, PwC and the other parties involved in the Scherer, Wansley, and Spruce transactions entered into a designation agreement for registration of confidential tax shelters under section 6111(d).

On or about June 1, 2000, PwC filed with the IRS in Kansas City, Missouri, Form 8264, Application for Registration of a Tax Shelter (Confidential Corporate

Tax Shelter), for the Spruce transaction.  On June 16, 2000, the IRS assigned tax shelter registration No. 00167000008 to the Spruce transaction.

On or about July 13, 2000, PwC filed a supplemental Form 8264 with the IRS in Kansas City, Missouri, for the Spruce, Scherer, and Wansley transactions. On July 18, 2000, the IRS issued tax shelter registration No. 00167000008 for the Scherer and Wansley transactions.

Unicom's tax return for its 1999 tax year included an appropriate disclosure statement under the then-effective regulations for a reportable transaction for UII on account of the test transactions.  It also properly disclosed tax shelter registration No. 00167000008 on Form 8271, Investor Reporting of Tax Shelter Registration Number, issued by the IRS in connection with the Spruce, Scherer, and Wansley transactions.  PwC monitored the status of the tax shelter registrations, including the registration No. 00167000008, for Unicom/UII and the Spruce, Scherer and Wansley transactions.

III.    MEAG Collateral Substitution

Enhancements in the Scherer and Wansley transactions were structured differently from those in the Spruce transaction.  CPS and Unicom used a CPUA as credit enhancement to secure the sublease obligations and provide the funds for the cancellation option exercise to CPS at the end of the sublease.  In the Scherer

and Wansley transactions, MEAG and Unicom used credit swap contracts issued by Ambac Credit to secure the payment of the purchase option exercise price. Under the swap contracts, MEAG would pledge high-quality securities primarily to Ambac Credit and secondarily to UII to pay the termination fees under the subleases or purchase option price. MEAG determined how it wanted to invest the money, with the ultimate goal to have sufficient funds to pay the purchase option price at the end of the Scherer and Wansley subleases.

Initially MEAG decided to invest the funds in short-term repurchase agreements, Federal agency discount notes, and a managed portfolio with Government-backed agency and Treasury securities. These short-term investments were rolled over and reinvested as they came due. Any ongoing investment risk, such as changes in interest rates over time, was borne entirely by MEAG.

In 2001 MEAG first suggested changing its investment portfolio by investing either in adjustable rate mortgage securities guaranteed by a Federal agency or Government-sponsored enterprise or in short-term money market funds rated AAA. Exelon agreed to the substitution. The securities continued to be pledged to Ambac Credit and Exelon.

Because the early 2000s ended up being a period of low interest rates, the funds invested by MEAG grew at a rate insufficient to fully fund the future purchase options. In 2006 MEAG proposed another substitution to Exelon, whereby MEAG would replace the existing collateral with a pledge of MEAG's own newly issued bonds insured by Ambac Credit. In August 2006 Exelon agreed to MEAG's request. This allowed MEAG to receive the funds it needed for environmental compliance and certain operational needs. Overall, MEAG replaced $173 million worth of collateral securities with its own bonds. MEAG also pledged an extra $81,171,330 of securities to Ambac Credit in 2007. In essence, MEAG remained obligated under the sublease agreements, and the bonds securing those sublease obligations were just another form of MEAG payment obligation.

When Ambac Credit's credit rating declined, MEAG contacted Exelon and received a waiver of the requirement that the bond insurance company maintain a certain credit level.

IV. Postclosing Monitoring

After the closing dates of the Spruce, Wansley, and Scherer transactions, the lessees were required to provide Unicom with certain financial and operational information. For example, CPS contacted petitioner regarding the impact of

higher property insurance rates following the September 11, 2001, attacks. In addition, as discussed above, Unicom consented to the construction of Spruce II and the MEAG collateral substitution.

In 2008 employees from Exelon's corporate finance and asset management groups inspected the Spruce, Wansley, and Scherer stations as part of a "compliance review" to ensure that the facilities were being operated and maintained properly. Before the on-site inspections, Exelon's employees reviewed various operating and financial performance indicators and data, and also requested applicable documents for the leased stations from CPS and MEAG. The review did not raise any red flags. Exelon did not conduct compliance reviews in any other years even though it had the right to visit the sites and request related documents each year.

V. Early Termination of the Spruce Transaction

Pursuant to an omnibus termination agreement, on or about February 26, 2014, CPS and Exelon terminated the Spruce transaction. Upon termination of the Spruce transaction, Exelon received $335 million in exchange for terminating its interests in the Spruce station. Possession of the Spruce station passed to CPS, free and clear of any claims or liens by Exelon.

Tax Returns, Notices of Deficiencies, Trial

I.      Tax Returns

A.      1999 Tax Year

Unicom timely filed the Unicom Group's consolidated Federal income tax return for the 1999 tax year.  On or about April 1, 2004, Exelon, as successor to Unicom, filed Form 1120X, Amended U.S. Corporation Income Tax Return, for the Unicom Group's 1999 tax year.  On or about August 25, 2004, Exelon filed a second amended tax return for the Unicom Group's 1999 tax year.  On or about January 9, 2007, Exelon filed a third amended tax return for the Unicom Group's 1999 tax year.

On its 1999 income tax return, Unicom had indicated taxable income of $2,484,829,531 and filed Form 8824, Like-Kind Exchanges, describing the transactions at issue here.  Unicom had not included in income deferred section 1031 gain of $1,231,927,407 arising out of the test transactions.

B.      2001 Tax Year

On or about September 26, 2002, Exelon, as successor to Unicom, filed its consolidated Federal income tax return for the 2001 tax year.  On or about April 1, 2004, Exelon filed an amended tax return for its 2001 tax year.  On or about January 30, 2007, Exelon filed a second amended tax return for the 2001 tax year.

On its 2001 income tax return, Exelon reported taxable income of $1,412,586,105. With respect to the transaction with CPS, Exelon had claimed a depreciation deduction of $2,968,648 an interest expense deduction of $38,261,289, and an amortized transaction costs deduction of $183,708. Exelon reported $40,476,248 of taxable rental income. Exelon had not reported taxable original issue discount income with respect to the transaction (which respondent determined claims to be $5,939,981 for the 2001 tax year).

With respect to the transactions with MEAG, Exelon had claimed a depreciation deduction of $5,447,849 an interest expense deduction of $46,547,887, and an amortized transaction costs deduction of $231,814. Exelon reported $50,370,556 of taxable rental income. Exelon had not reported taxable original issue discount income with respect to the transaction (which respondent determined claims to be $7,078,805 for the 2001 tax year).

II. Notices of Deficiency

A. 1999 Tax Year

On September 30, 2013, respondent timely issued a statutory notice of deficiency to petitioner for its income tax liabilities for the tax year ending December 31, 1999 (1999 notice of deficiency). Respondent determined a

deficiency in tax for 1999 of $431,174,592 and a penalty under section 6662(a) of $86,234,918.

Respondent disallowed petitioner's treatment of the transactions with CPS and MEAG as section 1031 like-kind exchanges. The 1999 notice of deficiency stated that deferred section 1031 gain of $1,231,927,407 should be included in income for tax year 1999, because petitioner "did not acquire and retain significant and genuine attributes of a traditional owner, including the benefits and burdens of ownership, of the Replacement Property."

The 1999 notice of deficiency determined a section 6662 accuracy-related penalty of 20% on the grounds of negligence or disregard of rules and regulations, or a substantial understatement of income tax.

B.    2001 Tax Year

On September 30, 2013, respondent timely issued a separate statutory notice of deficiency to petitioner for its income tax liability for the tax year ending December 31, 2001 (2001 notice of deficiency). Respondent determined a deficiency in tax for 2001 of $5,534,611 and a penalty under section 6662(a) of $1,106,922.

The 2001 notice of deficiency disallowed depreciation deductions of $2,968,648 and $5,447,849 claimed by Exelon for the CPS and MEAG sale-

leaseback transactions, respectively, because "the taxpayer failed to acquire and retain significant and genuine attributes of a traditional owner, including the benefits and burdens of ownership". Respondent disallowed interest expense deductions of $38,261,289 and $46,547,887, and amortized transaction costs deductions of $183,708 and $231,814, for the CPS and MEAG transactions, respectively. Respondent determined that because the transactions with CPS and MEAG were in substance loans, petitioner should have reported original issue discount (OID) income of $5,939,981 and $7,078,805 resulting from the deemed loans to CPS and MEAG, respectively. Furthermore, according to respondent, because petitioner did not acquire ownership interests in the CPS and MEAG transactions, it was not required to report rental income of $40,476,248 and $50,370,556, respectively, from the subleases in 2001.

In the alternative, respondent determined that sale-leaseback transactions with CPS and MEAG lack economic substance and should be disregarded for Federal income tax purposes. Accordingly, respondent disallowed petitioner's deductions of depreciation, interest expense, and transaction costs, and reversed rental income.

The 2001 notice of deficiency imposed a 20% accuracy-related penalty under section 6662 on the grounds of "negligence or disregard of rules and regulations regarding * * * [petitioner's] tax treatment of the SILO transactions."

In the alternative, respondent determined the section 6662 penalty for 2001 for a substantial understatement of income tax attributable to a tax shelter item of a corporation. Respondent conceded the issue of a substantial understatement of income tax under section 6662(a) and (b)(2) for 2001 before trial, so we need not in this Opinion address this ground for imposition of the section 6662 penalty for 2001.

III.  Trial

Exelon timely filed petitions in both cases on December 13, 2013. The Court held a three-week special trial session in Chicago, Illinois. During the trial, the parties presented the testimony of 16 fact witnesses and 10 expert witnesses. Both parties rely heavily on expert opinions to support their arguments. The parties' expert witnesses, their qualifications, and their Court-recognized areas of expertise are listed below. We also briefly summarize the conclusions of the experts in their respective expert reports.

A.      Petitioner's Expert Witnesses

1.      Stewart Myers

The Court recognized Stewart Myers as an expert in finance, valuation, and investments in the energy industry, as well as analysis of complex financial transactions including leases and real options.  Prof. Myers has a Ph.D. in finance and economics from Stanford, and he is the Robert C. Merton professor of financial economics at the MIT Sloan School of Management, where he has taught since 1966.

Prof. Myers' graduate-level textbook, Principles of Corporate Finance (with Professors Richard Brealey and Franklin Allen) is a highly regarded treatise.  He has also published dozens of articles on corporate finance and financial economics.  He was also a director for Entergy Corp., a large public utility and merchant power generator based in New Orleans, Louisiana, that also has generating plants in the eastern and northeastern United States.

In his expert report Prof. Myers discussed the primary factors that affect the decisions of the parties involved in the test transactions to exercise their respective options.  Prof. Myers testified that, while both MEAG and CPS do not pay income tax, their tax-exempt status does not affect their valuation of the leased stations.

Prof. Myers also testified that the accepted financial practice always makes decisions based on after-tax cashflows and rates of return.

Prof. Myers conducted sensitivity analysis involving several variables such as inflation and electricity price to determine the range of future market values of residual interests in the Spruce, Scherer, and Wansley stations and to see how it would affect the decisions of CPS and MEAG to exercise their cancellation/purchase options at the end of the sublease terms. He concluded that both CPS and MEAG would return their respective interests in the subleased stations to Exelon if the values of these interests at the end of the sublease terms were less than the purchase option prices. This would also cover the "base" scenario outlined in the Deloitte appraisal.

We find Prof. Myers' sensitivity analysis helpful because it illustrates that even a difference of 1%-2% in the inflation rate would dramatically change the future market value of an interest over a 30-year term. For example, in the case of the Spruce station, a 4% inflation rate--1.5% higher than the rate assumed by Deloitte--would result in the future market value of the plant of $971.1 million, almost $250 million above the exercise price of $723.2 million for the cancellation option and almost $350 above the fair market value projected by the Deloitte appraisal. Conversely, a 1% inflation rate--1.5% lower than the rate assumed by

Deloitte--would result in the future market value of the plant of $394.2 million, almost $330 million less than the cancellation option exercise price and over $200 million less than the fair market value projected by the Deloitte appraisal.

2.     John Reed

The Court recognized John J. Reed as an expert in transactions involving energy, industry firms and assets, energy market economic analyses, and evaluation and financial analysis related to the energy industry.  Mr. Reed is a graduate of the Wharton School of the University of Pennsylvania, where he received a bachelor of science degree in finance.

Mr. Reed is currently the chairman and CEO of Concentric Energy Advisors, Inc., a financial advisory and management consulting firm for energy industry firms.  Mr. Reed has over thirty-five years of experience in the energy industry, including as an executive in energy consulting firms and as chief economist for Southern California Gas Co., the largest U.S. gas utility.  He has also been involved in the purchase, sale, and valuation of energy-related assets, including the sales of over 50 fossil fuel power generating facilities.

In his expert report Mr. Reed concluded that, at the time Unicom, CPS, and MEAG entered into the test transactions, a significant uncertainty existed with respect to the future value of the Scherer, Spruce, and Wansley stations.  Mr. Reed

concluded that CPS' and MEAG's tax-exempt status would not influence their analysis of the future market value of the plants.

### 3. Karl A. McDermott

The Court recognized Karl A. McDermott as an expert in regulatory economics, the history of regulation, and capital investment decisionmaking in the power utility industry in the United States. Prof. McDermott has a Ph.D. in economics from the University of Illinois at Urbana-Champaign and serves as the Ameren distinguished professor of business and government at the University of Illinois Springfield. He has served as a lecturer and teacher for 36 years on topics regarding public utilities, banking, energy market regulation, gas wholesale markets, and macroeconomics. He has also published articles on the energy industry, the ICC, and energy market regulation. Prof. McDermott served as a commissioner for the ICC from 1992 to 1998, during the period when Illinois deregulated its energy market.

Prof. McDermott provided the Court with a primer on the U.S. energy market that also covered the periods both before and after many States (including Illinois) deregulated. In his expert report Prof. McDermott concluded that Unicom's investment in leases with CPS and MEAG allowed it to achieve the same risk and reward profile it had had before the deregulation of generation

assets in Illinois. Prof. McDermott stated that bankruptcy of CPS or MEAG was a relatively low probability although such bankruptcies had occurred in other jurisdictions.

### 4. Stuart Gilson

The Court recognized Stuart Gilson as an expert in the financial consequences of bankruptcy, including decisionmaking and financial consequences relating to bankruptcy proceedings. Prof. Gilson has a Ph.D. in finance from the University of Rochester and is a tenured professor in the Finance Department of Harvard Business School. His academic and consulting experiences focus on corporate finance, business valuation, credit analysis, and corporate restructuring and bankruptcy; and he has written several articles and case studies on those subjects.

In his expert report Prof. Gilson concluded that Unicom faced a risk of loss arising from a CPS or MEAG bankruptcy.[19] In the event of a CPS or MEAG bankruptcy, section 502(b)(6) of the Bankruptcy Code could limit the recovery available to Unicom to rent for the greater of one year or 15%, not to exceed three

---

[19]Prof. Gilson assumed that Georgia bankruptcy law would be changed to allow municipalities to take advantage of chapter 9 of the Bankruptcy Code. Alternatively, Prof. Gilson assumed that MEAG could have filed for protection under chapter 11 of the Bankruptcy Code if the bankruptcy court had determined that MEAG did not qualify as a municipality.

years, of the remaining term of the sublease. In his analysis Prof. Gilson did not consider various credit enhancements and contractual provisions available to Unicom in the case of a CPS or MEAG bankruptcy. Prof. Gilson concluded that the net financial impact on Unicom of an early sublease rejection would depend on the fair market value of the facility at the time of rejection. At low fair market value, Unicom could experience a loss at sublease rejection, but with the fair market value increase the net financial impact on Unicom would become increasingly positive.

5.    Mark E. Zmijewski

The Court recognized Mark E. Zmijewski as an expert in the field of accounting, and particularly accounting for financial analysis of leases. Prof. Zmijewski is the Leon Carroll Marshall professor of accounting at the University of Chicago Booth School of Business, where he has served on the faculty since 1984. Prof. Zmijewski has an M.B.A. in accounting and a Ph.D. in accounting from the State University of New York at Buffalo. Prof. Zmijewski teaches courses in valuation, mergers and acquisitions, financial analysis, accounting, and entrepreneurship. He has also published articles on accounting, discounted cashflow valuations, and securities regulation.

In his expert report Prof. Zmijewski concluded that the test transactions were structured as direct financing leases rather than SILOs. Prof. Zmijewski also concluded that the test transactions are not front loaded under any of the options available in the lease and are not tax driven.

6.     Ingrid Sarapuu

The Court recognized Ingrid Sarapuu as an expert in lease financing, leasing, and asset financing. Ms. Sarapuu has an M.B.A. from the University of Chicago Booth School of Business. She has been a licensed securities principal with Series 7, 24, 63, and 79 certifications. She also has over 30 years of executive experience in leveraged leasing and corporate finance in the private sector. In her expert report Ms. Sarapuu concluded that the test transactions are consistent with traditional leasing structures. Ms. Sarapuu also opined that Unicom engaged and appropriately employed various specialists and advisers to complete the test transactions.

7.     Nancy Heller Hughes

The Court recognized Nancy Heller Hughes as an expert in the valuation of power facilities. Ms. Hughes has an M.B.A. in finance and accounting from the University of Chicago Booth School of Business. She is also an accredited senior appraiser in the public utility discipline (as certified by the American Society of

Appraisers) and a certified depreciation professional (as certified by the American Society of Appraisers). She has also performed many appraisal and depreciation studies for businesses in the energy industry.

Ms. Hughes opined in her expert report that the Deloitte appraisals of Spruce, Scherer, and Wansley used an appropriate process for the purpose of producing credible appraisal reports under the Uniform Standards of Professional Appraisal Practice (USPAP). Ms. Hughes concluded that Deloitte's conclusions were appropriate, supported in its appraisal reports, and prepared in accordance with generally accepted appraisal procedures. Ms. Hughes did not offer an opinion of what the fair market value of the Spruce, Scherer, and Wansley stations would be at various stages of the test transactions.

B. Respondent's Expert Witnesses

1. Douglas J. Skinner

The Court recognized Douglas J. Skinner as an expert in accounting and financial economics. Dr. Skinner is the deputy dean for faculty and Eric J. Gleacher distinguished service professor of accounting at the University of Chicago Booth School of Business. Dr. Skinner holds a Ph.D. in applied economics: accounting and finance from the University of Rochester. Dr. Skinner has published research on a variety of topics in accounting, auditing, and corporate

finance, including how securities prices respond to corporate disclosures, how accounting information is used in contracts between various corporate stakeholders, the nature of corporate debt agreements, and many others.

Dr. Skinner concluded that the analyses in the Deloitte appraisals are flawed in a number of respects, but focused on two flaws in particular. First, in performing the discounted cashflow calculations necessary to value the underlying assets at the end of the sublease term, Deloitte applied the maximum statutory corporate income tax rate to the forecasted cashflows. Dr. Skinner opined that in asset valuation, the tax status of the buyer or seller can matter. According to Dr. Skinner, here, where both CPS and MEAG are tax-exempt entities, their cashflows are about 40% higher than the cashflows Deloitte assumes, significantly increasing the value of the assets at the sublease termination dates. Second, Dr. Skinner concluded that Deloitte also applied too high a discount rate to these cashflows, further reducing the estimated value of the assets.

Dr. Skinner recalculated the value of each asset using Deloitte's cashflows and applying a 0% tax rate and lower discount rates of 6.1% for Spruce and 6.3% for Wansley and Scherer. His calculations show an estimated value for each asset at the sublease expiration date that is substantially higher than the cancellation/purchase option exercise price. Thus, Dr. Skinner concluded that it

was nearly certain that CPS and MEAG will exercise their respective cancellation/purchase options at the end of the sublease terms, allowing Exelon to obtain the option proceeds without ever bearing any significant risk of loss.

In addition Dr. Skinner opined that CPS and MEAG would be economically compelled to exercise their cancellation/purchase options because of the "onerous" conditions they would face if they did not exercise their respective options.

Dr. Skinner in his expert report shows that, absent tax benefits available under section 1031, Exelon would never recover its initial investment in the lease. Thus, Dr. Skinner concluded that Exelon would be able to generate a positive return from the transactions only because of the tax benefits.

2.    Christopher Knittel

The Court recognized Christopher Knittel as an expert in energy and environmental economics, industrial organization, and regulation. Dr. Knittel is the William Barton Rogers professor of energy economics in the Sloan School of Management at the Massachusetts Institute of Technology. He has a Ph.D. in economics from the University of California at Berkeley. Dr. Knittel's research focuses on energy and environmental economics and policy, and how consumers, firms, and policymakers interact in the marketplace. Dr. Knittel has written articles on topics related to energy markets, policy and pricing; testified in front of

the U.S. House of Representatives Subcommittee on Agriculture, Energy and Trade; and consulted for large corporations and regulatory agencies on energy and environmental issues.

Dr. Knittel opined that the test transactions did not provide Exelon with new sources of operating profits, improve the company's environmental impact or supply management, assist Exelon with gaining market-entry benefits, improve knowledge-sharing, or achieve economies of scale. Dr. Knittel also opined that the test transactions were not compelled by the Illinois Restructuring Act. On the basis of his analysis of the potential direct and ancillary economics, he concluded that the test transactions did not provide Exelon with any non-tax-related economic benefits.

### 3. Uppender Saraon

The Court recognized Uppender Saraon as an expert in structured finance and leasing transactions. Mr. Saraon is a former director of Citigroup with a graduate degree in management from the MIT Sloan School of Management. Mr. Saraon opined that the structure of the test transactions, including the credit enhancement provisions, was very different from traditional U.S. leveraged leases.

C.      <u>Concurrent Witness Testimony Procedure</u>

The Court, with prior agreement of the parties, directed certain expert witnesses, including Prof. Myers, Dr. Skinner, and Mr. Reed, to testify concurrently.  The procedure was implemented in substantially the same way as in <u>Rovakat, LLC v. Commissioner</u>, T.C. Memo. 2011-225, slip op. at 29-30, <u>aff'd</u>, 529 F. App'x 124 (3d Cir. 2013).  <u>See also</u> <u>Green Gas Del. Statutory Tr. v. Commissioner</u>, 147 T.C. __, __ (slip op. at 52, 60-61) (July 14, 2016); <u>Buyuk, LLC v. Commissioner</u>, T.C. Memo. 2013-253, at *29-*30, *39-*40; <u>Crimi v. Commissioner</u>, T.C. Memo. 2013-51, at *34, *40-*43.  The Court found the procedure especially helpful in illuminating the major aspects of certain issues in these cases and enabling the Court to facilitate its findings of fact.

OPINION

I.      <u>Overview</u>

Section 1031(a)(1) prevents the recognition of gain or loss "on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment."  Our task in these cases is to analyze a set of transactions in which petitioner engaged in an attempt to defer taxation of almost $1.6 billion of gain on the sale of its two power plants.  To

achieve this result, petitioner entered into what it asserts were deferred like-kind exchanges under section 1031, with the replacement property being interests obtained in sale-leaseback transactions. The character of that replacement property interest is yet to be determined.

While traditional LILOs and SILOs involved leveraged leases, petitioner invested the proceeds from the sale of its own power plants to fully fund the transactions. The purported tax benefits were primarily derived from the deferral of income tax under section 1031 and various deductions related to the replacement properties. Although this Court has previously ruled on the tax consequences of certain SILO and LILO transactions, we have never ruled on the tax consequences of an ostensible like-kind exchange involving a SILO-like transaction funded fully by a taxpayer's own equity contribution. Therefore, these cases present an issue of first impression.

We note that while these cases involve several issues separate from but related to the validity of the test transactions under section 1031, our analysis of the latter question will govern our disposition of the former. Accordingly, we shall turn first to the section 1031 like-kind exchange issue.

A.     Overview of the Parties' Arguments

    1.     Petitioner's Arguments

In 1999 after conducting an evaluation of its strengths and weaknesses in the new deregulated energy market, petitioner decided to sell its entire fleet of fossil fuel power plants. After realizing that the sale would occur at a price almost two times higher than petitioner's initial estimate, petitioner sought ways to preserve the gain and possibly defer the income tax.

Petitioner contends that the test transactions represent valid deferred section 1031 like-kind exchanges, where petitioner exchanged its "active" ownership interests in two power plants in Illinois for "passive" leasehold interests in power plants in Georgia and Texas. Petitioner argues that it engaged in thoughtful decisionmaking and an extensive due diligence process in an effort to maximize the value for its shareholders and diversify its risks. Petitioner asserts that it acquired benefits and burdens of ownership with respect to assets involved in the test transactions because petitioner remained exposed to significant risks not only during the residual period of the headleases but also during the leaseback period.

Petitioner opposes respondent's attempts to characterize the test transactions as SILOs because they are structured not as leveraged leases but as direct leases financed entirely from petitioner's own funds. As petitioner sees it, it merely

reinvested the proceeds from the sale of its assets into similar assets in other geographical areas.

In doing so, petitioner maintains it acted in good faith and relied on services of independent and highly qualified advisers. Thus, petitioner argues that it should not be held liable for the penalties under section 6662 proposed by respondent.

### 2. Respondent's Arguments

Respondent primarily contends that the test transactions among petitioner, CPS, and MEAG did not transfer any benefits and burdens of ownership to petitioner because they were not true leases. Respondent argues that petitioner's SILOs were "prepackaged, promoted tax products which subjected [p]etitioner to no residual value risk, only a theoretical, de minimis credit risk." In essence, as respondent sees it, the test transactions are more similar to low-risk loans. Thus, because petitioner exchanged ownership interests in power plants for financial instruments (low-risk loans), petitioner failed to meet section 1031 like-kind exchange requirements.

Further, respondent argues that because the substance of each test transaction is a loan rather than a lease, these loans should generate original issue discount (OID) income under section 1272. According to respondent, petitioner is

not entitled to depreciation deductions under section 168, interest deductions under section 467, or transaction cost deductions under section 162.

In the alternative, respondent argues that the test transactions lack economic substance because they were driven by tax considerations and the desire to defer taxation of a $1.6 billion gain, not by a legitimate business purpose. Accordingly, respondent urges the Court to disregard the test transactions altogether and conclude that petitioner failed to enter into a like-kind exchange. Respondent maintains that petitioner never expected to realize pretax benefits from the test transactions alone. However, together with the tax deferral benefits available under section 1031, petitioner would be able to more than make up for the economic losses associated with the test transactions.

Further, respondent argues that petitioner is also liable for accuracy-related penalties under section 6662 for both tax years, 1999 and 2001, for negligently engaging in transactions that it should have known were "too good to be true". According to respondent, petitioner's tax reporting also resulted in a substantial understatement of income tax for the 1999 tax year.

B.     Primer on Leveraged Leases, LILOs, and SILOs

We have discussed in detail the seminal cases and regulations related to leveraged leases, LILOs, and SILOs in this Court's opinion in John Hancock Life

Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. 1, 15-16, 54-77 (2013). We briefly reiterate some of that analysis here to provide the reader with sufficient details relevant to the cases at hand.

Frank Lyon Co. v. United States, 435 U.S. 561 (1978), is the seminal Supreme Court case discussing leveraged lease transactions. The taxpayer in Frank Lyon engaged in a sale-leaseback transaction to finance the construction of a new building. Out of the required $7.64 million, Frank Lyon invested $500,000 of its own money and financed the remainder with a third-party lender through a secured mortgage with the building serving as a collateral. In addition, Frank Lyon made a promise to assume personal responsibility for the loan's repayment and an assignment to the lender of the rental payments under the lease. Id. at 566-568.

The lease in Frank Lyon was a net lease requiring lessee to pay taxes, insurance, and utilities. Lessee had an option to purchase the building at certain times during the lease and at the end of the 25-year lease term. Lessee also had an option to renew the lease for additional periods of time. Frank Lyon claimed depreciation deductions and interest expense deductions related to the building. Id. at 567-569.

After considering the transaction, the Supreme Court held that the form of a sale-leaseback transaction will be respected for Federal tax purposes as long as the lessor retains significant and genuine attributes of a traditional lessor. Id. at 584. The Supreme Court recognized that these attributes necessarily depend on the facts of a particular case. Id. According to the Supreme Court, several factors weighed in favor of the taxpayer in Frank Lyon. Frank Lyon bore the financial risks of the transaction by assuming responsibility for loan repayment and investing its own money in the transaction. Id. at 581. The Supreme Court concluded that there was a real possibility that the lessor could walk away from the transaction at the end of the initial lease. The parties negotiated the deal in good faith and were independent of each other. The parties paid the same tax rates, making the transaction tax neutral. The rent and purchase option prices were reasonable, and Frank Lyon assumed the credit risk of the lessee's defaulting on its rent payments. Id. at 575-584.

Around the time the Supreme Court issued its ruling in Frank Lyon, the Government was working on developing a set of rules to determine whether a leveraged lease transaction is a true lease or something else. In 1975 the Commissioner issued guidelines for advance ruling purposes on whether a leveraged lease will be respected for Federal tax purposes as a lease. Rev. Proc.

75-21, 1975-1 C.B. 715.  In 1984 Congress enacted what has become known as the "Pickle rule", which subjected property leased to a tax-exempt entity to unfavorable depreciation rules.  Deficit Reduction Act of 1984, Pub. L. No. 98-369, sec. 31, 98 Stat. at 509.

The unintended consequence of the Pickle rule was the proliferation of LILO transactions with tax-exempt entities.  LILO transactions were designed to work around the Pickle rule because the taxable party leased the property from the tax-exempt counterparty instead of buying it, and then immediately subleased it back to the tax-exempt entity.  To fund the transaction, the taxable party typically took out a nonrecourse loan covering 80%-90% of the initial lease.  See John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. at 11.

The sublease to a tax-exempt entity would typically be shorter than the initial lease term.  At the end of the sublease, the tax-exempt entity usually has the option to purchase the remainder of the leasehold interest in the initial lease.  Even if the tax-exempt entity decides not to exercise its purchase option, the taxable party could still compel the tax-exempt entity to renew the sublease, take possession of the asset, or procure the replacement sublease.  To return the asset to the taxable party, the tax-exempt entity would typically need to meet certain conditions, including refinancing the nonrecourse loan involved in the

transactions. Failure to meet the return conditions meant that the tax-exempt entity had to exercise the purchase option. See Id.

In 1999 LILO transactions became less popular because of a change in the regulations under section 467, which required that prepayment of the initial lease rent be treated as a loan for tax purposes. Id. at 16; see also sec. 1.467-4, Income Tax Regs. After that, investors started using SILOs to obtain similar results. See John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. at 16.

A typical SILO transaction would be similar to a LILO except that the term of the initial lease extends beyond the remaining useful life of the asset, as is the case with the Spruce, Scherer, and Wansley test transactions here. Thus, the initial lease is treated as a sale for Federal tax purposes. The end-of-sublease options for the taxable entity usually include either compelling the lessee to arrange a service contract for the asset for a predetermined term or to take possession of the asset. Id.

The payments in SILO and LILO transactions are typically secured by the various defeasance instruments. Although the form of such instruments differs from one transaction to another, typically they entail setting aside several deposits with third-party financial institutions--payment undertakers--for various payments due under the transaction documents, including purchase options. Id. at 12. As a

result of defeasance, the parties to the transaction do not have to come up with any out-of-pocket payments during the initial lease term. Id.

In 2002 the Commissioner issued Rev. Rul. 2002-69, 2002-2 C.B. 760, which explained that LILO transactions should be properly characterized as a future interest in property. Consequently, a taxpayer may not deduct rent or interest paid or incurred in connection with such a transaction. In the ruling the Commissioner stated that he would challenge tax benefit claims based on LILO transactions under the substance over form and economic substance doctrines. Id.

Congress eliminated the benefits associated with LILO and SILO transactions in the American Jobs Creation Act of 2004, Pub. L. No. 108-357, secs. 847-849, 118 Stat. at 1601. John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. at 16. That law was prospective in effect and did not apply to transactions entered by taxpayers before its effective date. Id.

C. Recent SILO/LILO Cases

As this Court observed in 2014 in John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. at 58, "[t]axpayers have lost their fight for claimed tax benefits in SILO and LILO transactions in all Courts of Appeals in which they have appeared." This still remains true.

The Commissioner has often used the doctrines of economic substance and substance over form to challenge the legitimacy of sale-leaseback transactions. See, e.g., Id. at 58-77 (analyzing prior SILO/LILO cases and arguments advanced by the litigants). We will discuss these judicial doctrines in more detail in other parts of this Opinion.

Our conclusion on whether petitioner entered into a valid like-kind exchange under section 1031 hinges on the proper characterization of the test transactions. If the transactions did not transfer the benefits and burdens of ownership to petitioner, then the test transactions are properly characterized not as leases but as loans. And if the transactions are characterized as loans, then petitioner had exchanged power plants for interests in financial instruments, which would cause petitioner to fail the requirements of section 1031. To aid in our analysis, we examine two cases, Consol. Edison Co. of N.Y., Inc. v. United States (ConEd II), 703 F.3d 1367 (Fed. Cir. 2013), rev'g and remanding Consol. Ed. of N.Y., Inc. v. United States (ConEd I), 90 Fed. Cl. 228 (2009), and John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. 1, in chronological order. While Consol. Edison and John Hancock did not involve purported section 1031 like-kind exchanges, the similarities between the two cases and the instant cases are many, and their legal reasoning is apposite here.

1.    Consol. Edison

There are many factual similarities between the cases at hand and the facts in Consol. Edison, so we will briefly reiterate the key facts.

In the mid-to-late 1990s Consolidated Edison (ConEd) was a publicly held vertically integrated utility company organized and operating in New York. ConEd I, 90 Fed. Cl. at 232.  In an attempt to offset the effects of the electric industry deregulation, ConEd underwent a major internal restructuring and decided to enter, through one of its subsidiaries, into one or more LILO investments.  Id. at 233-234.  On December 15, 1997, ConEd entered into a LILO transaction with EZH, a Dutch electric utility (ConEd LILO).  Id. at 234-235.

ConEd retained Cornerstone Financial Advisors L.P. to obtain financial services in connection with the EZH LILO.  Id. at 234.  ConEd retained the law firms of Shearman & Sterling, LLP as its United States legal counsel, and Loeff, Claeys, Verbeke as its Dutch legal counsel, as well as Deloitte as its appraiser, Duke Engineering & Services as its independent engineer, and Tauw Milieu, International, as its environmental consultant.  Id. at 235.

Under the terms of the ConEd LILO, ConEd leased from EZH a 47.47% undivided interest in a Dutch power plant for 43.2 years. ConEd II, 703 F.3d at 1370.  ConEd immediately leased back the interest to EZH for a term of 20.1

years.  Id. at 1370-1371.  At the end of the sublease term, EZH could exercise the

purchase option and terminate the transaction.  Id. at 1372.  If EZH declined to

exercise the purchase option, ConEd could either force it to renew the sublease for

an additional term of 16.5 years or take possession of the interest in the power

plant and operate it during the remaining term of the initial lease.  Id.

In its appraisal Deloitte concluded that there would be no "economic

compulsion" for EZH to exercise the purchase option at the end of the sublease

because the option price exceeded the projected value of the property.  Id. at 1379.

Richard Ellsworth, who led the Deloitte appraisal team, testified at trial that he did

not consider any noneconomic factors in arriving at this conclusion.  Id. at 1379-

1380.  On the basis of this conclusion and the record of the case as developed at

trial, the trial court concluded that the ConEd LILO was a true lease.  ConEd I, 90

Fed. Cl. at 340.  The Court of Appeals for the Federal Circuit reversed and

remanded the case.  ConEd II, 703 F.3d at 1369.

The Court of Appeals explained that at the time the trial court rendered its

ruling it did not have the benefit of the decision in another LILO/SILO case, Wells

Fargo & Co. v. United States, 641 F.3d 1319 (Fed. Cir. 2011).  ConEd II, 703 F.3d

at 1377.  Thus, the trial court used the wrong legal standard in determining

whether ConEd acquired benefits and burdens of ownership in the ConEd LILO.

Id. The Court of Appeals clarified that the relevant standard was whether there was a reasonable likelihood that the purchase option at the end of the sublease period would be exercised, not whether this outcome was "certain" or "virtually certain". Id. at 1376.

The Court of Appeals concluded that the analysis performed by Deloitte for the ConEd LILO was "boilerplate" and was insufficient to support ConEd's claims. Id. at 1378-1379. The Court of Appeals noted that Richard Ellsworth, who prepared the appraisal for the ConEd LILO, admitted at trial that Deloitte "never once found that there was 'economic compulsion' to exercise a purchase option" in about a hundred appraisal reports prepared for LILO transactions. Id. at 1380. The Court of Appeals commented that the appraisal failed in several respects, including not considering noneconomic factors, defeasance of funds for the purchase option payment, and the costs to EZH that would result from ConEd's exercise of the renewal or retention options. Id. at 1379.

After considering the arguments of the parties in ConEd II, the Court of Appeals concluded that "EZH was reasonably likely to exercise the purchase option * * * [and] ConEd has failed to show that the substance of the transaction included a genuine leasehold interest in which ConEd would bear the benefits and

burdens of a lease transaction." Id. at 1381. Accordingly, ConEd's deductions related to the LILO were properly disallowed. Id.

### 2. John Hancock Life Ins. Co. (U.S.A.) v. Commissioner

This Court first considered the Federal income tax consequences of SILO and LILO transactions in John Hancock Life Ins. Co. v. Commissioner, 141 T.C. 1. John Hancock Life Insurance Co. (John Hancock) entered into 27 LILOs and SILOs between 1997 and 2001. Id. at 6. The Court considered seven test transactions, including three LILOs and four SILOs (John Hancock test transactions). Id.

John Hancock invested in SILOs and LILOs primarily as a means to diversify its investments in domestic and international assets to provide it with sufficient cashflow. Id. at 8. All of the John Hancock test transactions had a typical structure for LILOs and SILOs, featuring a set of agreements including a headlease, a sublease with a fixed purchase option at the end, and various defeasance arrangements.

The Court considered the application of both the economic substance doctrine and the substance over form doctrine to the John Hancock test transactions: "In order to conclude that John Hancock is entitled to its claimed deductions, we must determine both that the test transactions have economic

substance and that the substance of each test transaction is consistent with its form. There is no clear formula by which to answer these questions, nor do we attempt to create one." Id. at 78.

The Court analyzed both objective and subjective sides of the John Hancock test transactions and concluded that they satisfied the economic substance inquiry because John Hancock had a realistic expectation of profit and a business purpose when entering into the transactions. Id. at 78-89.

To determine whether the John Hancock test transactions' form was consistent with their substance, the Court followed the same analysis the Supreme Court used in Frank Lyon for leveraged leases. Id. at 89-90 (citing Frank Lyon, 435 U.S. at 584). Thus, the Court had to determine whether John Hancock held a true leasehold interest in each LILO property and obtained an ownership interest in each SILO property. John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. at 89-90.

After discussing various factors previously considered in other cases, the Court reiterated its commitment to evaluate the John Hancock test transactions on the basis of the overall facts and circumstances in determining whether the substance of the transactions was consistent with their form. Id. at 90-91 (citing Levy v. Commissioner, 91 T.C. 838, 860 (1988), Torres v. Commissioner, 88 T.C.

702, 721 (1987), Gefen v. Commissioner, 87 T.C. 1471, 1490-1495 (1986), Mukerji v. Commissioner, 87 T.C. 926, 967-968 (1986), and Estate of Thomas v. Commissioner, 84 T.C. 412, 433-438 (1985)).  For each of the John Hancock test transactions, the Court considered risk allocation during the initial lease period, likelihood of purchase option exercise by the original property holder at the end of the sublease term, end-of-sublease alternatives for the parties involved in the transaction and related costs and risks.

The Court concluded that for all test transactions, John Hancock did not assume more than a de minimis risk during the sublease period because of contractual protections, various credit enhancements, and rent defeasance.  Id. at 94, 113-114, 145.

Next, the Court evaluated the likelihood of the original property holders' exercising their respective purchase options at the end of subleases.  The Court recognized that "[t]he courts that have analyzed SILO and LILO cases have adopted varying standards in determining whether a party to a SILO or LILO transaction will exercise its purchase option."  Id. at 95.  After analyzing various standards, the Court adopted the "reasonable likelihood" standard articulated by the Courts of Appeals for the Second Circuit in Altria Grp., Inc. v. United States, 658 F.3d 276, 286 (2d Cir. 2011), and the Federal Circuit in ConEd II, 703 F.3d at

1379, and <u>Wells Fargo</u>, 641 F.3d at 1329.  <u>Id.</u> at 95-97.  The inquiry into the likelihood of purchase option exercise is determinative because if the original property holder is reasonably expected to exercise the purchase option at the end of the sublease, the obligations of the parties under SILO/LILO would offset each other, so that a taxpayer would be insulated from any economic risk of loss and would not be able to take advantage of any potential gain.  <u>Id.</u> at 94.  Instead, a taxpayer would be guaranteed a fixed return on its investment at the end of a sublease term.  This would indicate that the taxpayer did not obtain any benefits or burdens associated with the leasehold or ownership interest transferred in a SILO/LILO.

For the LILO transactions in <u>John Hancock</u>, the Court concluded that "any legal, political, industrial, or technical objections to the nonexercise of the purchase options can be overcome, and thus are not determinative of whether [the LILO counterparty] is reasonably likely to exercise its purchase option."  <u>John Hancock Life Ins. Co. (U.S.A.) v. Commissioner</u>, 141 T.C. at 99, 107.  Thus, the Court based its ultimate conclusion primarily on financial analysis, including a comparison of the costs of the purchase option and alternative end-of-sublease options.  In all LILO test transactions, the Court concluded that it was reasonably likely that the LILO counterparties would exercise their respective purchase

options.  Id. at 109-110.  The Court came to the same conclusion for one of the

SILO transactions, the SNCB SILO.  Id. at 145.  Thus, the Court held that the

substance of all the LILO and SNCB SILO transactions was inconsistent with their

form and that these transactions resembled loans because John Hancock did not

acquire genuine attributes of ownership or leasehold interest.  Id. at 109-110, 145.

As a result, the Court held that John Hancock was not entitled to rental expense

and depreciation deductions related to these transactions.  Id. at 109-110, 145.

The Court also disallowed the interest expense for the nonrecourse loans John

Hancock took out to finance the transactions.  Id. at 146-147.  Further, the Court

recharacterized the equity contributions into these transactions as a loan giving

rise to the original issue discount (OID) income.  Id. at 148.  The Court held that

pursuant to section 1.1273-2(g)(4), Income Tax Regs., John Hancock's transaction

costs with respect to LILOs and the SNCB SILO must be included as an additional

amount lent to borrowers and are not deductible under section 162.  Id. at 149.

For the remaining SILO transactions, the Court concluded, after considering

financial analyses presented by the parties and various nonfinancial constraints,

that exercising the purchase option at the end of the sublease was not the only

financially viable alternative for the SILO counterparties.  Id. at 123, 131-132.

According to the appraisals, the projected fair market value of the assets involved

in the remaining SILOs was going to be substantially lower than the purchase option exercise price. Id. at 114-115, 123-124. Thus, the Court assumed that these options would not be exercised and proceeded with the analysis of whether John Hancock had any economic risk after the end of the sublease and until the end of the lease. The Court then concluded that John Hancock indeed faced economic risks indicative of ownership during that period under the service contract option because any payments under that option were not guaranteed. Id. at 132-135. Thus, the Commissioner did not succeed with the substance-over-form argument for these remaining transactions.

With respect to the remaining SILO transactions, the Court held that John Hancock acquired a future interest in the transferred assets and was thus not entitled to depreciation deductions before the purchase option exercise date. John Hancock Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. at 137. Because John Hancock had only future interest in the assets, the Court disallowed any interest deductions as well. Id. at 147. However, the Court refused to apply the OID rules to John Hancock's equity contributions in these transactions. Id. at 148. The Court allowed a deduction for transaction expenses related to the acquisition of a future interest in the underlying assets. Id. at 149.

II.    Whether the Substance of the Test Transactions Is Consistent With Their Forms

We will first address the issue of whether the substance of the test transactions is consistent with their forms because this is the primary argument on which respondent challenges petitioner's 1999 like-kind exchange. From the notices of deficiency and the parties' filings in these cases, it appears that respondent did not directly challenge the 1999 like-kind exchange gain deferral under the economic substance doctrine. Respondent asserts this economic substance argument only with respect to depreciation, interest, and transaction cost deductions reported on the 2000 tax return.

A.    Substance Over Form Doctrine Overview

The courts have long used the substance over form doctrine to determine the true nature of a transaction and appropriately recast it for Federal income tax purposes. See Feldman v. Commissioner, 779 F.3d 448, 455 (7th Cir. 2015), aff'g T.C. Memo. 2011-297, John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. at 57 (citing United States v. B.F. Ball Constr. Co., 355 U.S. 587 (1958), and Commissioner v. Court Holding Co., 324 U.S. 331 (1945)). We apply the substance over form principles only when warranted and generally respect the form of a transaction. John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. at 57 (citing Gregory v. Helvering, 293 U.S. 465 (1935), and Blueberry Land

Co., Inc. v. Commissioner, 361 F.2d 93, 100-101 (5th Cir. 1966), aff'g 42 T.C. 1137 (1964)).

We view the transactions as a whole to determine whether the substance over form doctrine applies. See Commissioner v. Court Holding Co., 324 U.S. at 334; John Hancock Life Ins. Co. (U.S.A) v. Commissioner, 141 T.C. at 91. As the Supreme Court held in Frank Lyon, 435 U.S. at 584, the form of a sale-leaseback transaction will be respected for Federal tax purposes as long as the lessor retains significant and genuine attributes of a traditional lessor. We also look at whether the taxpayer has undertaken substantial financial risk of loss of its investment on the basis of the value of the underlying property. Coleman v. Commissioner, 16 F.3d 821, 826 (7th Cir. 1994), aff'g T.C. Memo. 1987-195 and T.C. Memo. 1990-99.

The courts considering SILO/LILO transactions have almost universally concluded that the taxpayers never obtained the benefits and burdens of ownership or attributes of a traditional lessor and, thus, were not entitled to claim various associated deductions. See ConEd II, 703 F.3d at 1381-1382 (finding that the LILO was not a genuine lease and sublease); Altria Grp., Inc. v. United States, 658 F.3d at 291 (affirming jury finding that a series of LILO and other transactions failed the substance over form inquiry); Wells Fargo, 641 F.3d at 1330 (sustaining

the trial court's conclusion that the SILO transactions ran afoul of the substance over form doctrine); BB & T Corp. v. United States, 523 F.3d 461, 464 (4th Cir. 2008) ("[A]lthough the [transaction] form * * * involved a lease financed by a loan, BB & T did not actually acquire a genuine leasehold interest[.]"); John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. at 109-110, 145 (concluding that all LILO transactions and some SILO transactions at issue were in substance financial instruments, loans); UnionBanCal Corp. v. United States, 113 Fed. Cl. 117, 136 (2013) (concluding that the taxpayer did not obtain the requisite ownership interest to claim the deductions); AWG Leasing Tr. v. United States, 592 F. Supp. 2d 953, 981-982 (N.D. Ohio 2008) (finding that a SILO transaction involving an interest in a German waste-to-energy plant did not convey an ownership interest to the taxpayer to justify the deductions). The only notable exception is the SILO transactions analyzed in John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. at 111-137, where this Court concluded that because exercising the purchase option at the end of the sublease was not the only economically viable option for the original property owners and John Hancock was exposed to more than de minimis risk after the end of the sublease period, John Hancock acquired a future ownership interest in the underlying properties.

B.     Spruce Transaction

    1.     Sublease Term Risks

Petitioner advances several arguments to support its contention that it indeed had acquired benefits and burdens of ownership during the sublease term. First, petitioner maintains that it made a meaningful equity contribution to acquire the leases. Unlike parties in traditional LILO/SILO transactions, petitioner did not use any loans to pay the Spruce headlease rent. Instead, it paid with the proceeds of a recent sale of its own power plant. CPS returned only 76.9% of the headlease rent to prepay the rent during the Spruce sublease term. Petitioner argues that the 23.1% CPS retained after prepayment of the Spruce sublease rent satisfies any equity tests derived from judicial decisions and administrative guidance.

Second, petitioner maintains that the rights and obligations conveyed by the Spruce headlease and sublease agreements are typical of traditional leases and significantly alter the rights of the parties. Specifically, petitioner cites the necessity for CPS to obtain consent for improvements that could have a material impact on the value of the subleased property.

Third, petitioner points to its extensive due diligence efforts as indicative of obtaining a true ownership interest in the Spruce station.

Finally, petitioner claims that it was exposed to a significant risk of loss in case of CPS' bankruptcy and sublease rejection because of the limitations of section 502(b)(6) of the Bankruptcy Code.

We begin with an observation that what made SILO and LILO transactions abusive was not only the amount of equity invested by the parties entering into such transactions but rather the circular flow of money such transactions created. As the Court of Appeals for the Federal Circuit explained in Wells Fargo, 641 F.3d at 1330:

> [W]e are left with purely circular transactions that elevate form over substance. The only flow of funds between the parties to the transaction was the initial lump sum given to the tax-exempt entity as compensation for its participation in the transaction. From the tax-exempt entity's point of view, the transaction effectively ended as soon as it began. The benefits to Wells Fargo continued to flow throughout the term of the sublease, however, in the form of deferred tax payments. The third-party lender and its affiliate were also compensated for their participation, as were the creators and promoters of the transactions. These transactions were win-win situations for all of the parties involved because free money--in the form of previously unavailable tax benefits utilized by Wells Fargo-- was divided among all parties. The money was not entirely "free," of course, because it was in effect transferred to Wells Fargo from the public fisc.

Here, the funds necessary to fund the headlease rent came from the untaxed proceeds of the Collins power plant sale by petitioner. In addition to attempting to reap the benefits of long-term tax deferral under the section 1031 rules for like-

kind exchanges, petitioner claimed various tax deductions associated with its participation in the Spruce, Scherer, and Wansley transactions. Unlike the taxpayer in Frank Lyon, which entered into a sale-leaseback with another taxable entity such that the transaction was tax neutral as a result, petitioner entered into a transaction with a tax-exempt entity. This would allow petitioner to double-dip into the tax benefits by deferring the tax under section 1031 and using deductions related to the test transactions.

The structure of the cashflows in the Spruce transaction guaranteed the return of 76.9% of petitioner's initial investment just six months after the closing date in the form of rent prepayment under the Spruce sublease. During that period, CPS obtained credit enhancements to secure the payment of the rent. The rest of petitioner's investment was either used to pay the accommodation fee to CPS in the form of the NPV benefit or set aside pursuant to the Spruce CPUA to secure the payments of the stipulated loss value during the period of the Spruce sublease or the payment of the purchase option price at the end of the sublease. CPS obtained credit enhancement and insurance for the CPUA from AIG, and the interest rate risk was also insured.

Thus, similarly to traditional SILOs or LILOs, the Spruce transaction created a circular flow of money accompanied by a transfer of tax benefits from a

tax-exempt to a taxable entity. See Wells Fargo, 641 F.3d at 1330. In addition, the terms of the Spruce transaction ensured that only six months into the deal petitioner would be in the same cash position as if it had taken out a loan to finance the transaction, similar to traditional SILOs and LILOs. In effect, CPS did not have any control over petitioner's investment after the closing of the transaction with the exception of the NPV benefit, which was CPS' reward for entering into the Spruce transaction. Accordingly, we are not persuaded by petitioner's argument that a 100% upfront out-of-pocket investment precludes the finding that any of the test transactions were abusive.

We also disagree with petitioner's argument that the Spruce headlease or sublease somehow significantly altered the parties' rights and obligations with respect to the Spruce station. Under the Spruce headlease, petitioner did not have any obligations to CPS in respect of the maintenance, operation, or insurance of the Spruce station during the sublease term or the remainder of the headlease. If petitioner were to return the Spruce station to CPS at the end of the headlease or if the headlease was terminated, it was not required to meet any return conditions except making sure the Spruce station was free from petitioner's liens.

Under the terms of the Spruce sublease, CPS accepted all the risks related to the operation of the Spruce station throughout the sublease term. CPS also agreed

to observe certain maintenance and operating standards, subleasing restrictions, assignment rights, restrictions and requirements pertaining to alterations and modifications, environmental compliance, and minimum insurance coverage. These restrictions were designed to insulate petitioner's risk during the sublease term and ensure that in the worst case scenario--if CPS does not exercise its cancellation option at the end of the sublease--the Spruce station would be in good working condition.  In short, CPS merely agreed to operate the station during the sublease term in the same manner a reasonable owner would.  Similar to John Hancock, there is no evidence that before the closing date CPS was not already adhering to the same operating, maintenance, or environmental standards.  See John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. at 113. Petitioner's expert Prof. McDermott also concluded that the contractual terms of the test transactions mitigated many risks of ownership, including technological obsolescence, failure of utility assets, long-term market value changes, failure of payments, and changes in Government or regulatory requirements.

With respect to sublease and assignment restrictions, CPS could always ask petitioner for consent, the same as for improvements that could materially affect the value of the leased property.  In fact, in 2004, when CPS decided to build Spruce II, which would share the site and some facilities with the Spruce station,

petitioner gave its consent after a short site visit and receipt of a written confirmation from CPS that the construction was not going to affect the Spruce station value. Petitioner did not bother to visit the site after Spruce II was finally completed and started to work.

Next, we do not find that petitioner's own due diligence efforts are indicative of any ownership rights. Respondent points out that petitioner had to complete the due diligence process within the strict time limits imposed by section 1031. As a result, petitioner did not follow up on certain red flags raised in engineering reports. Moreover, Mr. Roling and others in petitioner's tax department only cursorily reviewed the tax opinion packages prepared by Winston & Strawn. Mr. Berdelle, who testified that he read the entire Winston & Strawn tax opinion, did not act on or inquire about inconsistencies therein of which petitioner was, or should have been, aware.

In most prior SILO/LILO cases taxpayers also engaged in extensive due diligence before to entering into the transactions, including hiring prominent law firms to draft documents, accounting firms to structure transactions and provide appraisals, and engineering firms to evaluate the properties. See, e.g., ConEd I, 90 Fed. Cl. at 234-235. That nonetheless did not prevent the courts in those cases from holding that the substance of such transactions was inconsistent with their

form and that the taxpayers did not obtain genuine attributes of ownership.  See, e.g., ConEd II, 703 F.3d at 1378-1379, 1381 (discussing the appraisal prepared by Deloitte and concluding that it was insufficient to support the taxpayer's contentions and was boilerplate; holding that the taxpayer failed to obtain genuine attributes of ownership to support the claimed deductions).

Finally, petitioner argues that it faced a substantial risk of loss in the event of CPS bankruptcy despite the available credit enhancements.  Petitioner attempts to distinguish these cases from the SILO and LILO transactions in John Hancock on this ground because in John Hancock none of the tax-exempt counterparties were subject to the limitations stated in section 502(b)(6) of the Bankruptcy Code.[20]  Respondent maintains that this risk was illusory and petitioner would be able to recover its investment even if section 502(b)(6) of the Bankruptcy Code limited the recovery available through the bankruptcy proceedings.

We agree with respondent.  Petitioner's claim is inconsistent with the record and is a mere attempt to blow out of proportion the risk of loss in the event of CPS' bankruptcy.  First, according to FCLC, petitioner's credit adviser, CPS was generally very creditworthy.  FCLC opined that the payment obligations and

_____

[20]Sec. 502(b)(6) of the Bankruptcy Code limits a lessor's claim for liquidated damages in bankruptcy resulting from the termination of a lease of real property to an amount not to exceed three years' rent plus any unpaid rent due under the lease at the time a debtor files its bankruptcy petition.

associated risks had been effectively identified and supported by credit enhancements so even in the case of CPS' bankruptcy petitioner would be able to fully recover its investments from the credit enhancement providers.

In 2000 CPS had one of the highest credit ratings in the country, and had cash on hand of over $450 million and a reserve fund surety policy in excess of $225 million. The City of San Antonio itself would have to file for bankruptcy before CPS became bankrupt. As of 2000 there had never been a failure of a major municipality in the history of the State of Texas. PwC explained that there was "bulletproof assurance" to Unicom that there was no practical exposure to loss during the first nine months of the CPS transaction, and that CPS' going bankrupt within the first six months of the transaction was commercially impossible. In addition, CPS obtained sufficient credit enhancements to secure the risk of rent nonpayment or early sublease termination.

We find that petitioner's speculations on what might happen if CPS filed for bankruptcy do not add anything of substance to our analysis. No transaction is absolutely protected from all possible risks, including catastrophic economic events or destruction of property "by a biblical flood or a superbolide meteor". UnionBanCal Corp., 113 Fed. Cl. at 135. The record here supports respondent's

argument that petitioner faced a risk of loss only in such a catastrophic event.[21]
We do not consider this risk sufficient to hold that petitioner had genuine
attributes of ownership during the Spruce sublease term. See id.

We also find that petitioner was sufficiently protected from the risk of
economic loss if the Spruce sublease terminated early. The sublease agreement
contained provisions that guaranteed that petitioner would receive stipulated loss
value payments in the event of CPS' default. These payments were predetermined
and set forth in a schedule to the Spruce sublease agreement. The payments would
be made out of the funds set aside at the closing date pursuant to the CPUA.

Petitioner argues that in case of an early Spruce sublease termination
petitioner would have to return any unaccrued prepaid rent to CPS. This argument
ignores the fact that after netting the unaccrued prepaid rent and the stipulated loss
value, petitioner would still recover its full investment in the lease, including
transaction fees and interest through the time of default. As Mr. Berdelle
explained in a memorandum prepared for the Unicom board meeting on April 4,
2000, requesting the approval of the like-kind exchange plan,

> [t]he stipulated loss values also include additional earnings protection
> of about $3 million per each $100 million of initial investment. For

---

[21]Petitioner's own expert Mr. McDermott stated in his expert report that the bankruptcy of a municipal utility is a relatively low-probability event but has occurred in other jurisdictions.

example, if there was a default on both the MEAG and CPS transactions (about $1.6 billion), Unicom would receive its investment and about $48 million pretax income in the year of default as earnings protection.

The Spruce transaction documents were drafted to reflect this understanding. We are thus satisfied that petitioner did not face any significant risks indicative of genuine ownership during the Spruce sublease term.

### 2. CPS Cancellation Option Decision

We next consider whether petitioner acquired the benefits and burdens of ownership in the light of the options available to petitioner and CPS at the end of the Spruce sublease period. First, we decide whether CPS was reasonably expected to exercise its cancellation option at the end of the Spruce sublease period. If it was, petitioner's profit was fixed at the outset of the Spruce transaction and petitioner did not acquire any benefits and burdens of ownership with respect to the Spruce station. See John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. at 139-143.

Petitioner relies primarily on the Deloitte Spruce appraisal to show that CPS was not "economically compelled" to exercise the cancellation option at the end of the Spruce sublease. This is so, as petitioner sees it, because the cancellation option price was set above the expected future fair market value of the Spruce plant at the end of the Spruce sublease term. To support the Deloitte appraisal

findings, petitioner invited several experts to submit expert reports and testify during the trial. We will discuss this testimony in due course.

Respondent relies primarily on the analyses of Dr. Skinner to argue that because CPS is a tax-exempt entity, it valued the Spruce station at a much higher level. Dr. Skinner asserts that there are a number of flaws with the Deloitte appraisal, including the very high corporate income tax rate and discount rate. Dr. Skinner suggested that because CPS was a tax-exempt entity, it would be more appropriate to use a 0% corporate income tax rate and a discount rate equal to CPS' weighted average cost of capital, about 6.1%.[22] This would result in a much higher projected value for the Spruce plant at the expiration of the sublease.

At the beginning of our analysis, we specify what constitutes "reasonable likelihood" that a purchase option will be exercised at the end of the sublease period. We reiterate that this Court does not require an "inevitable", "economically compelled", or similar threshold for purchase option exercise likelihood in evaluating SILO/LILO transactions. See id. at 95-97. We are also not requiring a "more likely than not" likelihood of purchase option exercise.[23]

_____

[22]Dr. Skinner explained that because CPS did not pay dividends to its shareholders, the appropriate weighted average cost of capital should be based on the interest CPS usually paid on its bonds.

[23]One of the recent cases considered by the Court of Federal Claims, while

(continued...)

We are looking simply at whether "in the light of all of the facts and circumstances known on the closing dates of the transactions, whether * * * [the taxpayer's] lessee counterparties were reasonably likely to exercise their purchase options." See Id. at 97.

Petitioner asserts that the Court of Appeals for the Seventh Circuit compared the option exercise price to the anticipated fair market value of the leased assets expected as of the closing of the lease in determining whether a transaction constitutes a true lease. See, e.g., In re Marhoefer Packing Co., Inc., 674 F.2d 1139, 1144-1145 (7th Cir. 1982) (considering whether option price was "nominal" in comparison to the fair market value of leased assets at the time the option could be exercised "as anticipated by the parties when the lease * * * [was] signed," for purposes of determining whether the lease should be recharacterized as a security interest); M & W Gear Co. v. Commissioner, 446 F.2d 841, 846 (7th Cir. 1971) (respecting Tax Court's finding that the lessee, rather than the lessor, acquired an equity interest in property, where "that the fair market value * * * was

---

[23](...continued)
acknowledging the reasonable likelihood standard as articulated in Wells Fargo & Co. v. United States, 641 F.3d 1319 (Fed. Cir. 2011), and Consol. Ed. of N.Y., Inc. v. United States, 90 Fed. Cl. 228 (2009), rev'd and remanded, 703 F.3d 1367 (Fed. Cir. 2013), seems to use a "more likely than not" standard in its actual analysis. See UnionBanCal Corp. v. United States, 113 Fed. Cl. 117, 131-132, 135-136 (2013).

at least twice as much as * * * [lessee's] option price"), aff'g 54 T.C. 385 (1970).

These cases lead petitioner to assert that "the appropriate standard for analyzing a

lessee's purchase option must focus on objective economic realities and whether

those realities compel exercise or strongly favor exercise to a degree of certainty."

We do not find that the cases petitioner cites establish a legal standard

incompatible with this Court's analysis in John Hancock and require economic

compulsion or circumstances that "strongly favor exercise to a degree of

certainty." In M & W Gear Co. v. Commissioner, 446 F.2d at 844-845 (discussing

in detail evidence regarding the intent of the parties), the Court of Appeals for the

Seventh Circuit considered not only the comparable sale prices for the leased

assets, but the intent of the parties at the time of entering the transaction. In In re

Marhoefer Packing Co., Inc., 674 F.2d at 1141, the same Court of Appeals

discussed only the issue of whether a specific lease in question with a $1 purchase

option qualified as a true lease or a security under the provisions of the Uniform

Commercial Code. This discussion is not pertinent here because it does not

pertain to any tax law issues. Finally, none of the cases petitioner cites involve a

lease supported by defeasance arrangements where both a lessee and a lessor

would have certain options at the end of the lease and where the lessee would have

some obligations under options available to the lessor.

Thus, we will follow the legal standard of "reasonable likelihood" that this Court has adopted in <u>John Hancock</u> following the Courts of Appeals for the Second Circuit and the Federal Circuit. As to comparing the option exercise price to the estimated future value of the asset in the context of SILO/LILO transactions, this Court previously explained in <u>John Hancock Life Ins. Co. (U.S.A.) v. Commissioner</u>, 141 T.C. at 99-100:

> [Lessee's] purchase option decision is not a choice between the purchase option price and the estimated fair market value of the remaining leasehold interest. It is a choice between the cost to [lessee] * * * of exercising its purchase option and its expected costs of not exercising its purchase option. In determining its expected costs of not exercising its purchase option, * * * [the lessee] must analyze the likelihood and consequences of * * * [the taxpayer's] choosing between the * * * [various options available to the taxpayer under the lease.]

Neither petitioner nor respondent argues that there are legal, political, industrial, or technical reasons that would weigh in favor of or against CPS' exercise of its cancellation option.[24] We will thus first concentrate on the financial and economic aspects of the Spruce transaction and then will consider other factors that we deem important for our analysis. See <u>id.</u> at 99.

---

[24]Respondent argues that because of the perceived synergies CPS could have derived from operating Spruce station and Spruce II together CPS was more likely to exercise the cancellation option at the end of the sublease term. Because CPS obtained petitioner's permission and constructed Spruce II several years into the sublease term, we do not rely on this argument in our analysis.

Petitioner argues that it would be financially disadvantageous for CPS to exercise its cancellation option.[25] According to the Spruce appraisal prepared by Deloitte and dated as of the Spruce transaction closing date, June 2, 2000, the fair market value of the Spruce plant was expected to be around $626 million on the basis of a discounted cashflow analysis[26] at the time the Spruce cancellation option can be exercised (adjusted for inflation at 2.5% per annum). The Spruce cancellation option price was set at $733,849,606. Petitioner suggests that this should be the end of the analysis because a reasonable person acting in its best

---

[25]We note that the Spruce transaction was terminated pursuant to the agreement of the parties in 2014. Exelon received an additional $335 million as the stipulated loss value payment from the CPUA proceeds, and CPS received $1 million. The record does not state the reason for termination.

[26]The value would be $609,600,000 using a cost approach. The Spruce appraisal stated, in relevant part:

> We are of the opinion that the discounted cash flow analysis provides a stronger indication of fair market value for the Facility than the cost approach since the discounted cash flow analysis reflects the impact to fair market value of the encumbered cash flows of the Facility. Since cash flows during this period are difficult to forecast with accuracy, we have conservatively relied upon the cost approach as the stronger indicator to estimate the residual value of the Facility at the end of the Lease Term and at the end of the Service Agreement Term.

We note that the cost approach would result in lower projected future fair market value according to Deloitte appraisals for the test transactions. We will use the discounted cashflow analysis because petitioner relied mostly on discounted cashflow in pricing the Spruce, Scherer, and Wansley transactions. We believe this will provide us with more consistent results.

economic interest would not overpay over a hundred million dollars for an asset when it can easily replace the asset on the market.

Petitioner's expert Prof. Myers conducted the sensitivity analysis of the Deloitte appraisal by changing certain assumptions such as the rate of inflation and electricity prices. His report and testimony mostly confirmed the obvious: when we change the assumptions used in the Deloitte appraisal, we are going to end up with different results. However, we found Prof. Myers' analysis helpful because it shows a range of possible scenarios related to the cancellation option exercise decision. Instead of giving the parties to a transaction a snapshot of the value using rigid assumptions as in the Deloitte appraisals, Prof. Myers' sensitivity analysis represents a more reliable tool to evaluate the range of scenarios based on varying economic assumptions. The following table sets out the fluctuation of the projected future value of the Spruce plant under various assumptions[27] according to Prof. Myers:

[27]For the base case scenario, Prof. Myers used Deloitte forecasted cashflows; average inflation at 2.5% throughout the headlease term; electricity prices starting at $31.75 per MWh in 2000 adjusted for inflation annually; plant capacity factor at 90.3% in 2000, declining to 58.7% in 2032, and to 49.6% in 2052; corporate tax rate of 40.85%.

| Scenario | Projected Spruce value in 2032 | Likely outcome and comments |
|---|---|---|
| Base case | $618.3 million | CPS returns Spruce to Exelon and replaces Spruce on the market; Exelon is better off not exercising the service agreement option. |
| Inflation +1.5% from base case | $971.1 million | CPS exercises cancellation option. |
| Inflation −1.5% from base case | $394.2 million | CPS returns Spruce to Exelon and replaces Spruce on the market; CPS has to pay a $125.9 subsidy to a PTPA provider to enter into the service agreement with Exelon; CPS still has $203.1 million overall benefit. |
| Electricity prices +30% above base case | $953.5 million | CPS exercises cancellation option. |
| Electricity prices −30% from base case | $283.2 million | CPS returns Spruce to Exelon and replaces it on the market; CPS has to pay a $175.4 million subsidy to a PTPA provider to enter into the service agreement with Exelon; CPS still has $264.6 million overall benefit. |

According to Prof. Myers, CPS would never elect to repurchase the Spruce station and cancel the headlease to avoid the cost of a PTPA subsidy. In other words, if CPS deems it undesirable to exercise the purchase option, it will always be better off with paying a subsidy to the PTPA provider and walking away from the Spruce station at the end of the Spruce sublease term. Prof. Myers also concluded that it was appropriate for Deloitte to use the 40.85% corporate tax rate and a 10% discount rate because the tax-exempt status of an actual lessor does not affect its pricing considerations when most other players on the market are taxable entities.

Another expert who testified on behalf of petitioner, Mr. Reed, also opined that because of uncertainty about the future "it would have been impossible based on any realistic assessment of the future value of Exelon's interest in the Facilities to determine whether or not the parties were reasonably expected to exercise their respective options."

Petitioner also introduced the testimony of Ms. Hughes, who opined that Deloitte complied with the USPAP standards and its analysis framework was appropriate and reasonable. Although the courts have previously admitted expert reports with similar conclusions, such reports were given little weight. See, e.g., ConEd II, 703 F.3d at 1380 (discussing Kelly expert report). We find that Ms. Hughes' report did not add anything of substance to the discussion. Ms. Hughes did not perform her own analysis and did not opine on the fair market value of the assets at issue. She merely attempted to bolster the credibility of the Deloitte work, and we do not find this attempt particularly helpful. As this Court has previously explained, an appraiser's compliance with USPAP is not the sole determining factor as to whether the appraiser's valuation report is reliable. See Whitehouse Hotel Ltd. P'ship v. Commissioner, 131 T.C. 112, 127-128 (2008) (declining to adopt USPAP as the sole standard for reliability of an appraisal), vacated and remanded on other grounds, 615 F.3d 321 (5th Cir. 2010); SWF Real

Estate LLC v. Commissioner, T.C. Memo. 2015-63, at \*98 (declining to find that an appraisal report was unreliable solely for failure to comply with USPAP requirements and stating that the Court will independently review the report for reliability).

Respondent's primary expert witness, Dr. Skinner, challenged the Deloitte appraisal because it used too high a tax rate and discount rate. Dr. Skinner suggested that because CPS was a tax-exempt entity, Deloitte should have used pretax cashflows to determine the fair market value of the Spruce plant at the end of the sublease. Dr. Skinner also asserted that the appropriate discount rate for the Spruce plant should be 6.1%, on the basis of CPS' weighted average cost of capital. With the corrected assumptions, Dr. Skinner concluded that it would be beneficial for CPS to exercise the cancellation option because it would value the Spruce plant much higher than the Deloitte appraisal, at $1.5 billion. Dr. Skinner further concluded that CPS would be "nearly certain" to exercise the cancellation option at the end of the sublease term.

First, we agree with petitioner that to the extent Deloitte was tasked to determine the fair market value of the Spruce plant at certain points, it should have disregarded the tax status of the actual buyer and should have used the prevailing market discount rate. It is well established that fair market value is "the price at

which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy and sell and both having reasonable knowledge of relevant facts." Bank One Corp. v. Commissioner, 120 T.C. 174, 209, 304-306 (2003), aff'd in part, vacated in part on other grounds, and remanded sub nom. JPMorgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006); Crimi v. Commissioner, T.C. Memo. 2013-51, at *60 (citing United States v. Cartwright, 411 U.S. 546, 551 (1973)); see also sec.1.170A-1(c)(2), Income Tax Regs. As this Court explained, under the willing buyer and willing seller standard, "[t]he willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the individual characteristics of these hypothetical persons are not necessarily the same as the individual characteristics of the actual seller or the actual buyer." Estate of Trenchard v. Commissioner, T.C. Memo. 1995-121, 69 T.C.M. (CCH) 2164, 2169 (citing First Nat'l Bank of Kenosha v. United States, 763 F.2d 891, 893-894 (7th Cir. 1985), Estate of Curry v. United States, 706 F.2d 1424, 1428-1429, 1431 (7th Cir. 1983), Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981), and Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990)). This court has previously declined to narrow the scope of willing buyer and willing seller to a particular category of parties. Bank One Corp. v. Commissioner, 120 T.C. at 315.

The hypothetical willing buyer and willing seller test applies in situations where the amount of tax due depends directly on the fair market value of the property at issue. However, our task here is not to determine the fair market value of the property, but rather whether it was reasonably likely that in the year 2032 CPS would exercise its cancellation option. As previously stated, that depends on weighing the cost to CPS of exercising the option against the cost to CPS of not exercising the option. The parties to the transaction are not hypothetical, but are CPS and petitioner, each with unique characteristics. It is therefore entirely proper for us to consider those unique characteristics in evaluating the likelihood that the cancellation option at issue here would actually be exercised.

We agree with Prof. Skinner that there are several flaws in the Deloitte appraisal. First, Deloitte used the 9% State corporate income tax rate in all appraisals for test transactions. According to Deloitte, "[t]he 9 percent tax rate represents the appropriate corporate income tax rate in the state of Texas' stepped tax rate schedule based upon tax year and taxable amount." In the context of the Spruce transaction, this statement sounds odd. Texas does not impose a State corporate income tax. It is possible that the cashflows from the Spruce plant thus would be taxed at a different rate. This could potentially increase the value of the

Spruce plant in both 2000 and 2032. However, we do not think this flaw necessarily fatal to the Spruce appraisal.[28]

Second, we find that Winston & Strawn attorneys interfered with the appraisal process' integrity and independence by providing Deloitte with the wording of the conclusions it expected to see in the final appraisal reports. Deloitte confirmed in its engagement letter that "[t]he appraisal will be conducted in conformity with the * * * [USPAP] of the Appraisal Foundation and the Principles of Appraisal Practice and Code of Ethics of the American Society of Appraisers." USPAP ethics rules require an appraiser to "perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests." Appraisal Foundation, Uniform Standards of Professional Appraisal Practice 2 (1999). USPAP ethics rules also prohibit an appraiser from accepting an assignment "that includes the reporting of predetermined opinions and conclusions." Id.

---

[28]If we calculate the present value of a stream of revenue equal to $100 per year at 10% discount rate and with a 40.85% tax rate over a period of 30 years and compare the results with the present value of the same revenue stream taxed at 35%, the difference will exceed $50. We note, however, because the tax rate affects the numerator in the present value calculation, slight fluctuations in the tax rate may not have a significant enough effect to require completely discarding an appraisal as unreliable. To compare, a 1% change in the discount rate, which affects the denominator, would also bring up by $50 the present value of the revenue stream above.

Petitioner argues that the list of conclusions Winston & Strawn communicated to Deloitte was merely a statement of the existing guidance and tests on the issue of what is considered a true lease. We do not find this argument persuasive. According to petitioner, Deloitte's appraisal team was known for its expertise and experience in the appraisal field. There was no reason for concern that Deloitte was unaware of the existing guidance on characterization of leases for Federal tax purposes. We see Winston & Strawn's letter dated December 29, 1999, informing the Deloitte team of the conclusions the law firm needed to see in order to issue an opinion at the requisite level as an attempt to obtain certain results. Our finding is supported by a pattern of communications between Winston & Strawn and Deloitte where Winston & Strawn provided regular feedback at all stages of the project, starting with Deloitte's engagement letter.

Petitioner asserts, and Deloitte's representative, Mr. Ellsworth, testified on this point at trial, that Deloitte arrived at the fair market value of the assets at issue independently. Nonetheless, even if that is true, Deloitte also performed the appraisal of the relinquished power plants, Powerton and Collins. Deloitte therefore was aware of the amount of untaxed gain petitioner was looking to defer. This further undermines the reliability of the appraisal reports Deloitte provided for all test transactions.

Further, in analyzing the likelihood of cancellation option exercise by CPS, Deloitte failed to consider the costs of a potential subsidy CPS would have to pay to a qualified bidder or operator to entice such a bidder/operator to enter into an operating agreement or PTPA with petitioner if the energy industry does not fare as well as expected. Prof. Myers, however, considered such costs and concluded that in most cases CPS would still be better off taking the money and returning the Spruce station to petitioner.

As to the likelihood of the cancellation option's exercise, it is unhelpful to petitioner's argument that Deloitte failed to consider the costs that CPS would have to incur to bring the Spruce plant to the required (per the Spruce sublease agreement) minimum operation standards for estimated annual capacity, net energy output, and efficiency. Meeting these requirements is a prerequisite for CPS to return the Spruce station to Exelon at the end of the sublease term. According to the Spruce sublease agreement, if CPS were to fail to deliver the Spruce station meeting the minimum operating and efficiency requirements, it would have to pay the diminution of fair market value or will be given another chance to exercise the cancellation option. Prof. Myers also failed to take these costs into consideration in his analysis.

Thus, the price of failing to exercise the cancellation option for CPS would consist of (1) undertaking investments required to bring the Spruce station into compliance with the minimum operating standards and other return requirements; (2) securing a replacement property or source of electricity and related costs; and (3) potential subsidies to qualified bidders and transaction costs should Exelon decide to exercise the operating agreement or the service agreement options.

To be more specific, CPS and petitioner agreed that if CPS decided to return the Spruce station at any time during the sublease or at the end of the sublease term in 2032, the Spruce station was required, at a minimum, to have an annual ratio of the actual net generation to the normal claimed capacity of at least 82% (capacity factor), operating for 8,760 hours per year. The Spruce station was also required to have the ratio of available generation to maximum generation of at least 89% and have an annual ratio of the heat energy output of not more than 10,950 Btu/kWh.

Deloitte and Prof. Myers, however, used significantly lower capacity factors in their computations. These figures were based on Deloitte's due diligence of the Spruce station and the engineering reports provided by Stone & Webster. Both Deloitte and Prof. Myers assumed the plant capacity factor to be 90.3% in 2000, with gradual decline to 58.7% in 2032 (the end of the sublease term) and to 49.6%

in 2052 (end of the Spruce headlease). These numbers, according to Prof. Myers, reflected the gradual obsolescence of the plant.

Discounted cashflow analysis performed by Deloitte and Prof. Myers incorporated the plant capacity factor and the hours of operation to determine the cashflows from the Spruce plant and determine its value in 2032. This "real Spruce plant", however, was not what petitioner was entitled to receive at the end of the Spruce sublease period. Petitioner was entitled to receive, because CPS had agreed to deliver, a plant that would operate in 2032 at a plant capacity factor 23% greater than anticipated by petitioner's experts. This "hypothetical Spruce plant" would, therefore, generate a much higher revenue stream and would have a value significantly higher than the value projected by Deloitte and Prof. Myers.[29]

Therefore, we conclude that the plant Exelon was entitled to receive at the end of the sublease term had characteristics distinctly different from those

---

[29]According to the Deloitte appraisal, the plant capacity factor for Spruce would go down to 72.2% by year 16 of the sublease, with the available hours of operation going down to 6,325. Deloitte estimated that the Spruce plant would operate at these levels up to year 30 of the sublease, and at year 31 of the sublease the Spruce plant capacity would be at 58.7%, with hours of operation at 5,139 per year. If the Spruce plant continued to operate throughout the term of the sublease at a minimum return requirements level (82% capacity factor and 8,760 operation hours per year), the cashflows in years 16-32 of the sublease would be at least 10% to 23% higher than anticipated by Deloitte. We also do not find reliable the Spruce plant value determined under the cost approach in the Deloitte appraisal. It is clear the appraisal considered the cost of purchasing an asset that would not meet the minimum operating requirements under the Spruce sublease agreement.

assumed by Deloitte and Prof. Myers. Although the parties did not submit any evidence regarding the amounts CPS would be required to invest in the Spruce station to meet the return standards, the requirement to do so significantly changes the economics of the Spruce transaction.

We note that Prof. Myers stated in his analysis that "a capacity factor 20% above [Deloitte] forecasts would move the return vs. cancel boundary up enough to include the base-case scenario [in Prof. Myers' analysis that petitioner would retain the plant]." What Prof. Myers has not considered in his analysis, however, is how the parties allocated the risks and costs related to the diminution in the power plant efficiency. According to the Spruce transaction agreement documents, that risk was shifted to CPS. As we explained, if the Spruce plant failed to meet the minimum operating standards at the time it was returned to Exelon, CPS would have to either pay up the diminution in fair market value or exercise the cancellation option to cut its losses.

Under the circumstances, we find it significantly more likely that CPS, should it attempt to walk away from the transaction and return the Spruce station to Exelon, would face substantial economic losses. Accordingly, we find that the range of scenarios under which CPS would decide to exercise its cancellation

option is significantly broader than expected by petitioner's experts, including Prof. Myers.

We also find that both petitioner and CPS, experienced power plant operators having the benefit of professional legal and other advice, understood that the terms of the Spruce transaction were inconsistent with the Deloitte appraisal and the projected future value of the Spruce station. The parties understood that it would be very difficult, if not impossible, for CPS to return the Spruce plant at the end of a 32-year sublease in almost the same condition in which CPS received it in 2000 without significant investment. Thus, the parties understood and reasonably expected at the time of entering into the Spruce transaction that CPS would exercise the cancellation option at the end of the sublease because meeting the return conditions would be extremely burdensome. According to Prof. Myers' analysis, with the required capacity factor of 82% in 2032, more than 20% higher than projected in the Spruce appraisal, it would be economically beneficial for CPS to exercise its cancellation option.

Moreover, we note that when the City of San Antonio brought suit in court to obtain a declaratory judgment of the continued validity of certain covenants in its outstanding public securities--thereby allowing CPS to enter into the transaction with petitioner--in its initial draft of the petition the city represented

that it intended to exercise the cancellation option. Even though this representation was subsequently deleted at the suggestion of Winston & Strawn and PwC, this Court infers an understanding among the parties that CPS would exercise the option to reacquire the Spruce plant. At the very least, it was reasonably likely at the time of the transaction that the purchase option would be exercised.

### 3. Conclusion

We hold that the Spruce transaction fails the substance over form inquiry because petitioner did not acquire the benefits and burdens of ownership of the Spruce station. Petitioner's investment was not subject to more than a de minimis risk of loss. We need not consider the risks and benefits to petitioner of the remaining headlease period because it was reasonably likely that the circular flow of money allowing petitioner to fully recover its investment and interest would close on the last day of the Spruce sublease.

We agree with respondent that the transaction most closely resembles a financial arrangement. Specifically, the Spruce transaction resembles a loan from Exelon to CPS. Exelon funded the Spruce transaction entirely with its own funds and received the funds back with interest in two tranches: the first tranche six months after the closing date and the second tranche at the end of the Spruce

sublease term in the form of the cancellation option payment. Exelon's return on its investment was predetermined, and Exelon did not have an upside potential or much of downside risk with respect to the Spruce station. This is more indicative of a loan than of a genuine equity investment.

Accordingly, we sustain respondent's disallowance of Exelon's depreciation deductions claimed on the 2001 tax return with respect to the Spruce transaction.

### C. Scherer and Wansley Transactions

Because the Scherer and Wansley transactions are structured and documented very similarly, we discuss them together. We use the same analysis framework as for the Spruce transaction.

#### 1. Sublease Term Risks

Petitioner and respondent make the same arguments for the Scherer and Wansley transactions as for the Spruce transaction.

First, as we noted in discussing the Spruce transaction, a 100% out-of-pocket investment does not necessarily make a transaction nonabusive from a tax standpoint. Here, petitioner indeed used the untaxed proceeds from the sale of the Powerton station and did not use any loans to finance the Scherer and Wansley transactions (collectively, MEAG transactions). However, petitioner got 77.9% of its initial investment back just six months after the closing of the MEAG

transactions in the form of prepaid rent from MEAG. A portion of the remaining 22.1% of the initial investment was placed into a trust account and invested in low-risk securities to provide for the payment of the MEAG purchase option at the end of the sublease period for MEAG transactions. Another portion was set aside to provide MEAG with the NPV benefit in consideration for entering into the transactions. For the same reasons we discussed for the Spruce transaction, we do not find that an out-of-pocket investment automatically shows that petitioner acquired benefits and burdens of ownership of Scherer and Wansley stations. This is especially important when six months into the transaction petitioner was in substantially the same cash position as with using loans to finance the leases.

Second, similarly to the Spruce transaction, we do not see the rights and obligations conveyed by the Scherer and Wansley respective headlease and sublease agreements as significantly altering the rights of the parties. Petitioner did not have any obligations to MEAG with respect to the maintenance, operation, or insurance of the Scherer and Wansley stations during the sublease term or the remainder of the headlease. Petitioner also did not have to meet any return conditions in the case of headlease termination. The rights and obligations of the parties under the Scherer and Wansley subleases were essentially the same as in the Spruce transaction, with MEAG bearing all the costs and risks related to the

interests in the stations it conveyed to petitioner in the MEAG transactions. As we observed in the discussion of the Spruce sublease, the terms of the sublease agreements were designed to insulate petitioner from any operational risks.

Third, similar to the Spruce transaction, we do not find that petitioner's due diligence efforts are somehow indicative of a true ownership interest in the Scherer and Wansley stations.

We also do not find any merit in petitioner's argument that it was exposed to a risk of MEAG's going bankrupt during the Scherer and Wansley sublease terms. Petitioner received an opinion from Holland & Knight that confirmed that the laws of the State of Georgia did not allow municipalities to declare bankruptcy. Petitioner's own expert, Dr. Gilson, confirmed in his expert report that Georgia would have to change its laws to allow MEAG to declare bankruptcy. We consider this scenario highly unlikely. See UnionBanCal Corp., 113 Fed. Cl. at 135 (discussing that highly unlikely risks do not add substance to a LILO transaction). In any event, credit enhancements put in place at the outset of the MEAG transactions provided petitioner with sufficient protection from that risk.

We find that petitioner also did not face a substantial risk of loss with respect to the payment of the Scherer and Wansley rent by MEAG. The rent was prepaid six months into the sublease term, and the stipulated loss value provisions,

together with MEAG and UII swaps, insulated petitioner from any significant risk of loss in this respect.

### 2.	Purchase Option Decision

We now turn to an analysis of whether it was reasonably likely that at the closing of the Scherer and Wansley transactions MEAG would exercise its purchase option.  Similarly to the Spruce transaction, we will look not only at fair market value of the assets involved as of the option exercise date, but also to the costs to MEAG if it decides to forgo exercising the option.  We will also briefly address the rights of the Scherer and Wansley coowners, who also received a right to exercise the purchase option if MEAG decided to forgo it.

#### a.	MEAG

Neither petitioner nor respondent argues that there are legal, political, industrial, or technical reasons that would weigh in favor of or against MEAG's exercise of its purchase option.  Thus, we consider financial and economic aspects of the MEAG transactions first.

According to the Deloitte appraisal, the undivided interests petitioner received under the MEAG transactions were estimated to have fair market values of $203,800,000 for Wansley and $485,000,000 for Scherer using a discounted

cash flow analysis,[30] adjusted for inflation at 2.5% per annum, at the respective lease expiration dates. The Wansley purchase option price was set at $214 million, and the Scherer purchase option price was set at $537.1 million, with $143,543,915 and $179,284,424 allocable to the Wansley and Scherer test transactions, respectively. Because the Deloitte appraisals and expert reports addressed the Wansley transactions without allocating the values between Wansley 1 and 2, we will use the aggregate analysis and will assume that the projected value of the Wansley interest conveyed in the test transaction bears the same ratio to the overall projected value of the Wansley as the purchase option exercise value for the test transaction to the overall purchase option price.

The Deloitte appraisals for the Scherer and Wansley stations suffer from the same deficiencies we identified in our review of the Spruce appraisal. Deloitte elected to use the 40.85% corporate tax rate that included a 9% State corporate tax rate, even though MEAG does not pay income tax (and even if it did, Georgia taxes its corporations at a flat 6% rate). Winston & Strawn attorneys were very closely involved in the appraisal report preparation process. Deloitte did not consider the costs MEAG would have to incur if it decided not to exercise the

---

[30]The cost approach inflation-adjusted values are $191,300,000 for the Wansley and $481,000,000 for the Scherer interest. For the same reasons we discussed supra note 26, we will be using the discounted cashflow results.

purchase option, including the costs of bringing the plants up to the required operating standards. Deloitte also did not consider any additional factors that could make MEAG's cotenants consider exercising the purchase options, including obtaining majority control over the Scherer and Wansley stations.

Petitioner's expert witnesses made the same arguments as for the Spruce transaction. Mr. Reed opined that it was impossible to predict with a degree of certainty whether MEAG or its cotenants would exercise the purchase options at the end of the Scherer and Wansley subleases. Ms. Hughes opined that the Deloitte appraisals conformed with the USPAP principles and the Deloitte analysis was reasonable and appropriate. Prof. Myers conducted the sensitivity analysis of the Deloitte appraisals and confirmed that if the inflation or electricity prices were higher than predicted by Deloitte, it would increase the likelihood of MEAG's exercising the purchase options.[31] Prof. Myers concluded that MEAG would never purchase Wansley or Scherer in order to avoid the cost of a PTPA subsidy. Prof. Myers also recognized that changes in other factors, including capital investments, capacity factors, and discount rates will affect MEAG's decision.

---

[31]We also note that Prof. Myers used a different corporate tax rate (38.9%) for the Wansley and Scherer transactions. His discounted cashflow results, however, were comparable to those in the Deloitte appraisal reports because of several adjustments made by Prof. Myers, such as capital investments.

Respondent's expert witness Dr. Skinner suggested that Deloitte should have used a 0% corporate tax rate to analyze the MEAG transactions and used a 6.3% discount rate based on cost of debt to MEAG. Dr. Skinner also suggested that Deloitte should have conducted sensitivity testing at least for corporate rates. With the new assumptions, Dr. Skinner concluded that MEAG would value the Scherer and Wansley stations a lot higher than the purchase option price and thus would be almost certain to exercise the purchase option.

For similar reasons as those we discussed for the Spruce transaction, we agree that Deloitte should have used a 0% corporate tax rate and the prevailing discount rate in its analysis.

As with the Spruce transaction, a further problem with the Scherer and Wansley appraisals is that Exelon was entitled to a operating efficiency of Scherer and Wansley at the end of the sublease significantly higher than the values used by Deloitte in the respective appraisals. If the Scherer and Wansley stations did not meet the minimum operating requirements outlined in the respective subleases, MEAG would have to pay damages reflecting the diminution in the value of the stations due to decreased efficiency. Deloitte and Prof. Myers failed to consider these costs in analyzing whether MEAG would exercise the purchase options at the end of the Scherer and Wansley subleases.

For Wansley, petitioner was entitled to receive, because MEAG had agreed to deliver, the Wansley station at the end of the sublease with a capacity factor of at least 62% based on 8,760 hours of operation per year with the net energy output of at least 85%. The Wansley appraisal by Deloitte and Prof. Myers' report assumed a plant capacity factor of only 66.5% in 2000, declining to 39.2% in 2028 (Wansley sublease expiration year) and to 32.6% in 2045. These numbers were based on the engineering reports prepared by Stone & Webster. Thus, petitioner was entitled to receive Wansley at the end of the sublease operating at a capacity factor only 4.5% lower than at the beginning of the sublease. Petitioner's entitlement with respect to the capacity factor was 22.8% higher than projected by Deloitte and Prof. Myers.

For Scherer, petitioner was entitled to receive, because MEAG had agreed to deliver, the Scherer station at the end of the sublease term in 2030 with at least 62% capacity factor based on 8,760 hours of operation per year and net energy output of 87.5%. Deloitte and Prof. Myers assumed the plant capacity factor to be 66.5% in 2000, declining to 39.9% in 2030. These numbers were based on the engineering reports prepared by Stone & Webster. Thus, petitioner was entitled to receive Scherer at the end of the sublease operating at a capacity factor only 4.5% lower than at the beginning of the sublease. Petitioner's entitlement with respect

to the capacity factor at the time of the Scherer return was 22.1% higher than projected by Deloitte and Prof. Myers.

Our observations for the MEAG transactions are very similar to the Spruce transaction discussion. Both petitioner and MEAG had vast experience with operation of power plants. Both petitioner and MEAG had the benefit of legal, tax, and other professional advice before and at the time of entering the transaction. Both petitioner and MEAG agreed to the return conditions set out in the Scherer and Wansley sublease contracts and understood the importance of the minimum operating standards.

Thus, it was reasonably likely at the time the MEAG transactions were entered into that MEAG would exercise the purchase option at the end of the Scherer and Wansley subleases, because meeting the return conditions would be extremely burdensome, if not impossible, for MEAG.

Petitioner may argue that Exelon faced a risk that MEAG would not have sufficient funds to pay the purchase option exercise price. We observe that indeed MEAG replaced the collateral pledged to Ambac Credit and Exelon under the UII and MEAG swaps with MEAG's own debt. We also observe, however, that both Ambac Credit and petitioner consented to such an exchange. Ambac Credit and petitioner would not have consented to the collateral replacement if they had

anticipated they would have any problems with the payment at the end of the sublease term. In fact, one of the goals of replacing the collateral was to replace the Government securities, which did not give sufficient yield in the beginning of the 2000s, with relatively secure but higher yield instruments. Because MEAG could not declare bankruptcy under the laws of Georgia, we find that petitioner did not bear any significant risk of nonpayment at the end of the sublease periods for the Scherer and Wansley stations.

b.    Cotenants

One of the significant differences between the MEAG transactions and the Spruce transaction is that MEAG's cotenants in the Wansley and Scherer stations received the right to exercise the purchase option at the end of the subleases should MEAG fail to do so. Petitioner and respondent did not put much emphasis on that right in their briefs. Prof. Myers, petitioner's expert, concluded that cotenants would use the same analysis as MEAG to decide whether to exercise the purchase options. We agree with this statement, but we also emphasize that the cotenants may have some other significant considerations that may make it more likely that they will step in and purchase the interests in the Scherer and Wansley stations if MEAG fails to do so. This further insulates petitioner from the risk of loss in the MEAG transactions or a risk of MEAG's nonpayment.

### 3. Conclusion

We hold that the Wansley and Scherer transactions fail the substance-over-form inquiry because petitioner did not acquire the benefits and burdens of ownership of the Scherer and Wansley stations. It was reasonably likely at the time the MEAG transactions were entered into that MEAG or its cotenants would exercise the purchase options at the end of the sublease term. Accordingly, we do not need to consider the risks and benefits to petitioner of the remaining headlease periods. We agree with respondent that the MEAG transactions most closely resemble financial arrangements. Specifically, the MEAG transactions resemble loans from Exelon to MEAG because Exelon's income was predetermined and the transaction did not have an upside potential or significant downside risks for Exelon. Because Exelon funded the transactions with its own funds and there are two distinct tranches of money it expected to receive back, it is appropriate to characterize each transaction as creating two loan instruments: one to be repaid six months after the closing date in the form of prepaid rent, and the second to be repaid at the time of the purchase option payment. Accordingly, we sustain respondent's disallowance of Exelon's depreciation deductions claimed on the 2001 tax return with respect to the Spruce transaction.

III.  Economic Substance of the Test Transactions

Respondent further asserts that we should disallow petitioner's depreciation, interest, and transaction cost deductions claimed on the 2001 tax return because the test transactions lacked economic substance.  Respondent did not directly challenge the 1999 like-kind exchange gain deferral under the economic substance doctrine.  Because we resolve the issues related to the disputed deductions claimed in petitioner's 2001 tax return on substance over form grounds, we need not address this alternative theory.

IV.  Consequences for the 1999 Tax Year Section 1031 Like-Kind Exchange Adjustment

Section 1031(a)(1) provides:  "No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment."  The regulations further explain that "the words 'like kind' have reference to the nature or character of the property and not to its grade or quality.  One kind or class of property may not, under * * * section [1031], be exchanged for property of a different kind or class."  Sec. 1.1031(a)-1(b), Income Tax Regs.

We have held that all of the test transactions failed the substance over form inquiry because petitioner did not acquire the benefits and burdens of ownership in

the assets involved in the test transactions. We have also concluded that the test transactions are more similar to loans made by petitioner to CPS and MEAG because petitioner's return on its investment was predetermined at the time petitioner entered into the test transactions. Accordingly, in 1999 petitioner exchanged the Powerton and Collins power plants for an interest in financial instruments. Such an exchange fails to meet the "like kind" requirement outlined in the Code and the regulations. Thus, petitioner must recognize the gain it received in 1999 on the sale of the Powerton and Collins plants under section 1001.

## V.    2001 Interest Expense Deductions and Rental Income

Six months after the closing of the test transactions, petitioner received prepayment of all rent from CPS and MEAG due under the respective sublease agreements. Petitioner reported the rent payments as income according to the provisions of section 467.

Section 467 governs the reporting of rental income from rental agreements that are treated as leases for Federal income tax purposes and which either have increasing or decreasing rents, or prepaid or deferred rents. See sec. 467(d)(1); Sec. 1.467-1(c), (h)(12), Income Tax Regs. If a rental agreement constitutes a section 467 rental agreement, the lessor and the lessee must take into account only

the sum of the section 467 rent and interest during the taxable year. Sec. 1.467-1(b), Income Tax Regs.

We have concluded that petitioner did not acquire the benefits and burdens of ownership in the Spruce, Wansley, or Scherer plant. We have also concluded that the test transactions most closely resemble financial arrangements in the form of loans from petitioner to CPS and MEAG. Thus, the agreements among petitioner, CPS, and MEAG are not lease agreements for Federal tax purposes under section 467, and petitioner may not deduct interest or include rental income with respect to them for the taxable year 2001. This is consistent with our conclusion that petitioner failed to enter into a like-kind exchange in 1999 and must recognize the gain on the sale of the Powerton and Collins stations.

VI.     Original Issue Discount and Transaction Expenses

A taxpayer receives OID income when a debt instrument is issued for less than its face value. See Sec. 1273; United States v. Midland-Ross Corp., 381 U.S. 54, 85 (1965); and John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. at 147. "The holder of a debt instrument with OID generally accrues and includes in gross income, as interest, the OID over the life of the obligation, even though the interest may not be received until the maturity of the instrument." John

Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. at 147 (citing section 1272(a)(1)).

Respondent argues that petitioner has OID income arising out of petitioner's equity contribution that would be repaid through the cancellation/purchase options with interest. Respondent suggests that such contributions should be treated in the same manner as a zero-coupon bond. Respondent further contends that the terms of each test transaction established a guaranteed, fixed return to Exelon through the use of defeasance instruments. Respondent maintains that we should follow the same approach as in John Hancock, where this Court upheld the Commissioner's recharacterization of a number of SILO transactions as in substance a loan from the taxpayer to the counterparties and applied the OID rules. Id. at 148.

Petitioner's main argument is that the test transactions should be characterized as leases, not loans, and thus petitioner does not have any OID income. For the reasons set forth in the previous portions of the opinion, this argument lacks merit. Because petitioner, CPS, and MEAG reasonably expected that the respective cancellation/purchase options would be exercised at the end of the sublease period, the purchase option price was fixed, and the funds for payments set aside (defeased) as of the closing date, the transactions represent

fixed obligations similar to those discussed in <u>John Hancock</u>. Accordingly, we uphold respondent's application of the OID rules and his calculation of OID income thereunder.

In addition, we note that because each transaction was fully funded by petitioner's money and created two distinctive tranches of money--one payable in six months, one at the end of the respective sublease term--each tranche should be treated as a separate debt instrument under the OID rules.

Ordinary and necessary business expenses paid or incurred in carrying on any trade or business are generally deductible. <u>See</u> sec. 162(a). We have concluded as to all test transactions that they are properly characterized as loans from petitioner to CPS and MEAG. We also concluded that for each transaction, the loan consisted of two tranches, one due six months after the closing date, the other due at the time of the cancellation/purchase price option payment. Under section 1.1273-2(g)(4), Income Tax Regs., transaction costs must be included as an additional amount lent to the borrowers. <u>See also</u> <u>John Hancock Life Ins. Co. (U.S.A.) v. Commissioner</u>, 141 T.C. at 149. Thus, petitioner's transaction costs related to the test transactions are not deductible and should be allocated to the

- 161 -

respective loans.  The parties are further directed to address the issue of

transaction cost allocation in Rule 155 computations.[32]

VII.   Section 6662 Penalties

   A.     Overview

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty

on the portion of an underpayment of tax attributable to negligence or disregard of

rules and regulations or a substantial understatement of income tax.  The accuracy-

related penalty does not apply to any portion of an underpayment for which a

taxpayer had reasonable cause and acted in good faith.  See sec. 6664(c)(1).

This Court previously held that the statutory provisions shifting the burden

of production to the Commissioner with respect to penalties are inapplicable to

corporations.  See NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006) (holding

that section 7491(c) does not apply to a C corporation's liability for a penalty, an

addition to tax, or an additional amount).  Petitioner in the consolidated cases

before us is a corporation.  Thus, the provisions of section 7491(c) do not apply.

Respondent determined accuracy-related penalties pursuant to section

6662(a) of $86,234,918 for the 1999 tax year and $1,106,922 for the 2001 tax year

---

[32]We recognize that there may be several ways to approach this issue.  One way would be to allocate transaction costs pro rata to the amounts of the respective loans.  The other way would be to allocate expenses on the basis of the billing records and invoices of petitioner's advisers related to the transactions at issue.

in the respective notices of deficiency. Respondent determined these penalties on the grounds of negligence and disregard of rules and regulations and substantial understatements of income tax. Respondent has conceded the substantial understatement of income tax grounds for the 2001 tax year.

Petitioner argues that no penalty is appropriate in these cases because petitioner was not negligent, did not disregard any applicable rules and regulations, and acted reasonably and in good faith when relying on the tax advice of its advisers, who adequately considered all relevant law under the applicable standards at the time of the transactions. In addition, petitioner asserts that the OID income cannot be included in the penalty computations because this argument has only recently been introduced and developed by the Commissioner and the courts, and petitioner could not anticipate such an assertion in 1999 and 2000, at the time of closing the transactions.

### B. Negligence or Disregard of Rules and Regulations

We will address the issue of negligence or disregard of rules and regulations first because it was determined as the ground for penalties in both notices of deficiency on which these cases are based.

Section 6662(a) and (b)(1) imposes a 20% penalty on any portion of an underpayment of tax attributable to negligence or disregard of rules or regulations.

Negligence includes "any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." Sec. 1.6662-3(b)(1), Income Tax Regs. Negligence is "strongly indicated" when the taxpayer fails to make a reasonable inquiry into correctness of an item that appears "too good to be true." Id. subpara. (1)(ii).

Disregard includes "any careless, reckless or intentional disregard of rules or regulations," which includes "the provisions of the Internal Revenue Code, temporary or final Treasury regulations * * * and revenue rulings or notices (other than notices of proposed rulemaking) issued by the Internal Revenue Service and published in the Internal Revenue Bulletin." Id. subpara. (2). Disregard is "careless" if the taxpayer does not use "reasonable diligence to determine the correctness of a [tax] return position that is contrary to the rule or regulation." Id. Disregard is "reckless" if the taxpayer "makes little or no effort to determine whether a rule or regulation exists under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe." Id. Finally, disregard is "intentional" if a taxpayer knows of the disregarded rule or regulation. Id.

However, the penalty does not apply to any portion of an underpayment for which a taxpayer had reasonable cause and acted in good faith. See sec. 6664(c)(1). This defense can be established through reasonable and good-faith reliance on advice received from a competent tax professional. See United States v. Boyle, 469 U.S. 241, 250-251 (1985); sec. 1.6664-4(b)(1), Income Tax Regs.

Respondent argues that petitioner failed to make a reasonable attempt to comply with the existing tax laws and failed to exercise ordinary and reasonable care in the preparation of the tax returns for the years at issue. Respondent asserts that Exelon should have known that the like-kind exchange and the test transactions provided it with a result "too good to be true" and should have evaluated the transactions more carefully. Respondent also asserts that Exelon was aware that LILO transactions were already under scrutiny from the IRS and did not sufficiently closely review the tax opinions provided by Winston & Strawn at the time of entering into the transactions.

Petitioner, in turn, argues that it conducted a thorough due diligence of all aspects of the like-kind exchange and test transactions before deciding to engage in them. Petitioner also argues that it reasonably relied in good faith on the advice it received from its advisers on the various aspects of the transactions, including tax treatment. Because the issue of whether petitioner under section 6662(a) was

negligent or disregarded rules or regulations is so closely intertwined in these cases with whether petitioner under section 6664(c) reasonably and in good faith relied on advice it received from tax professionals, we consider the two issues together.

It is well recognized that taxpayers may establish that they should not be liable for a section 6662 penalty if they acted in good faith and reasonably relied on advice of a tax professional. Reliance on a professional tax adviser, however, does not automatically establish reasonable cause and good faith. Sec. 1.6664-4(b)(1), Income Tax Regs. Instead, all facts and circumstances must be taken into account, including the taxpayer's knowledge and experience and the reliance on the advice of a professional. Id. In the case of reliance on an opinion or advice, the facts and circumstances inquiry should account for "the taxpayer's education, sophistication and business experience," as well as whether "the taxpayer knew, or reasonably should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law." Id. para. (c)(1).

To show that reliance on advice of a tax professional constitutes reasonable cause, the taxpayer must prove by a preponderance of the evidence the following three requirements: (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and

accurate information to the adviser, and (3) the taxpayer actually relied in good faith on adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Reliance may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about. Id. at 98. In addition, the advice must not be based on unreasonable factual or legal assumptions and must not unreasonably rely on representations, statements, findings, or agreements of the taxpayer or any other person. Sec. 1.6664-4(c)(1)(ii), Income Tax Regs.

Petitioner claims it reasonably relied in good faith on Winston & Strawn's tax advice and therefore no accuracy-related penalty should be imposed. Respondent contends that petitioner's reliance on Winston & Strawn was unreasonable and not in good faith because Winston & Strawn was too involved in the structuring of the transactions to provide a reliable tax opinion.

First, we will analyze the factors outlined in Neonatology. The record in these cases and the testimony of the parties establishes that petitioner carefully considered various factors, including necessary expertise in tax, in selecting its tax adviser. Winston & Strawn, in petitioner's opinion, was a strong firm possessing the necessary qualifications and expertise in handling similar deals.

We do not find that Winston & Strawn was so involved in structuring the transaction that reliance on its tax opinions was per se unreasonable. Petitioner contacted Winston & Strawn to provide advice on the transaction, and there is no evidence that Winston & Strawn had a conflict of interest in rendering its advice. Winston & Strawn billed its normal hourly rates, and its fee did not depend on the closing of the test transactions. Cf. Kerman v. Commissioner, T.C. Memo. 2011-54, slip op. at 43 (finding that a tax opinion was burdened with an inherent conflict of interest where the fee for it was based on the amount of loss generated for the taxpayers in a CARDS transaction), aff'd, 713 F.3d 849 (6th Cir. 2013). Thus, petitioner met the first prong of the Neonatology test.

As to the second prong of the Neonatology test, the parties do not dispute that Winston & Strawn was closely involved in the transactions and knew all the relevant facts to render a tax opinion. Respondent does not allege that petitioner misrepresented any material facts to Winston & Strawn, and the record does not contain any indicia that this was the case.

However, as we discussed above, Winston & Strawn's tax opinions were based in large part on the appraisals prepared by Deloitte. We found that Winston & Strawn interfered with the integrity and the independence of the appraisal process by providing Deloitte with a list of conclusions it expected to see in the

appraisals to be able to issue tax opinions at the "will" and "should" level. Such interference improperly tainted the Deloitte appraisal, rendering it useless. Further, because Winston & Strawn directed the conclusions that Deloitte had to arrive at, we are highly suspicious that the tax opinions are similarly tainted.

We also concluded that the technical and engineering assumptions used in the Deloitte appraisals were inconsistent with the return conditions specified in the test transaction documents, which made the exercise of the purchase/cancellation options considerably more likely. Winston & Strawn, as the firm that drafted the transaction documents and was closely involved in all stages of the test transactions, knew or should have known of this defect and that its tax opinions were therefore based on unreasonable assumptions and arrived at unreasonable conclusions in the light of how the transactions were actually structured. See sec. 1.6664-4(c)(1)(ii), Income Tax Regs.

The third prong of the Neonatology test requires the taxpayer to show that it relied in good faith on the adviser's judgment. There is a longstanding policy of not requiring taxpayers to second-guess the work of a tax professional providing the advice. As the Supreme Court has stated, "[t]o require the taxpayer to challenge the attorney, to seek a 'second opinion,' or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the

advice of a presumed expert in the first place." Boyle, 469 U.S. at 251; see also Bruce v. Commissioner, T.C. Memo. 2014-178, at *56-*57 (finding it was objectively reasonable for the taxpayer to rely on the advice of his longtime tax adviser, even though the Court concluded that the advice was incorrect), aff'd, 608 F. App'x 268 (5th Cir. 2015); Estate of Giovacchini v. Commissioner, T.C. Memo. 2013-27, at *113-*114 (finding reasonable cause and good faith where there was no requirement under the circumstances to second-guess the advice of a CPA).

Sophistication and expertise of a taxpayer are important when it comes to determining whether a taxpayer relied on a tax professional in good faith, or simply attempted to purchase an expensive insurance policy for potential future litigation. Petitioner had been involved in the power industry since 1913 and described itself as "an electric utility company with experience in all phases of that industry; from generation, transmission, and distribution to wholesale and retail sales of power." Although petitioner did not have experience with section 1031 transactions, it certainly had experience in operating power plants and must have understood the concept of obsolescence.

Petitioner indeed engaged many advisers to assist with the due diligence and documenting the transactions at issue. Petitioner's employees recognized that they did not have expertise in like-kind exchanges and thus sought help from outside

lawyers, accountants, and other consultants to guide them in the transactions.[33] Petitioner formed an internal project team that was responsible for investigating and evaluating the like-kind exchange opportunity. The team included high-level employees with experience in tax, finance, and engineering. The team reported its findings to petitioner's board of directors, and the board approved the transactions. Although the board did not have the benefit of reviewing the final versions of the tax opinions, it did have a chance to ask questions of the Winston & Strawn team as well as the PwC team.

Petitioner's employees and the board, however, had other considerations in mind as well: They were under pressure to find a reasonable solution to the problem of higher-than-anticipated revenue from the sale of its fossil fuel power plants. The clock on the section 1031 transaction was ticking, and the amount at stake--over $1.6 billion of potentially taxable sale proceeds--was too significant to let the like-kind exchange plan fall apart. Our analysis of the test transactions shows that petitioner knew or should have known that CPS and MEAG were reasonably likely to exercise their respective cancellation/purchase options

---

[33]In addition to Winston & Strawn, petitioner engaged PwC (financial and accounting adviser), Arthur Andersen (accounting adviser), Sidley Austin (regulatory counsel), Deloitte (valuation), Stone & Webster (engineering and environmental adviser), Vinson & Elkins (Texas counsel), and Holland & Knight (Georgia counsel).

because they would not be able to return the Spruce, Scherer, and Wansley power plants to petitioner without incurring significant expenses to meet the return requirements.

It is true that Winston & Strawn provided a very favorable tax opinion on the test transactions, notwithstanding the obvious inconsistency of the return provisions and the projected plant capacity factor at the end of the respective subleases. Yet we are not persuaded that Winston & Strawn's tax opinion can serve as a shield for petitioner under the circumstances. We believe that petitioner fully recognized that a plant with a capacity factor of 82%--the minimum rate at which the Spruce station had to be running when returned by CPS upon expiration of the sublease--would be worth significantly more than the same plant with a capacity factor of 58%--the capacity factor used in the Deloitte appraisals.[34] Petitioner, as a sophisticated power plant operator, must have appreciated that it would be very expensive for CPS to sufficiently upgrade the plant to meet the capacity requirements. Thus, petitioner must have understood that Winston & Strawn's tax opinions, based on the Deloitte appraisals, were flawed.

This brings us to two conclusions: first, petitioner could not have relied on the Winston & Strawn tax opinions in good faith because petitioner, with its

---

[34]See supra note 29 for a fuller explanation of these numbers. The difference in capacity factors for MEAG transactions was in the same range.

expertise and sophistication, knew or should have known that the conclusions in the tax opinions were inconsistent with the terms of the deal. Second, in the light of the previous conclusion, petitioner's alleged reliance on Winston & Strawn's tax advice fails the <u>Neonatology</u> test.[35]

We note that petitioner expended significant resources on due diligence and consulting fees related to the like-kind exchange and the test transactions. However, we find troubling petitioner's cavalier disregard of the risks connected with the test transactions and the underlying facts. Mr. Berdelle, petitioner's controller and a senior employee with substantial discretionary and strategic authority, testified that he had read the Winston & Strawn tax opinions and was otherwise intimately involved in the decisionmaking process behind the proposed transaction. In addition, Winston & Strawn had advised petitioner of certain tax risks that could accompany the proposed transactions, and indeed petitioner registered the test transactions as a confidential corporate tax shelter around the same time it entered into the transactions.

---

[35] Petitioner also alleges that it relied on its auditor, Arthur Andersen, to raise red flags about the transactions. According to petitioner, Arthur Andersen had no objections or challenges to petitioner's reporting of the like-kind exchange. Unlike petitioner, Arthur Andersen did not have the benefit of vast experience in operating power plants and may have overlooked the issue of return conditions. The record is also silent as to what documents related to the transactions were actually reviewed by Arthur Andersen and to what extent. We are thus not persuaded by petitioner's argument.

It is true that Mr. Roling and other employees of petitioner besides Mr. Berdelle had only cursorily read the opinion package prepared by Winston & Strawn. This fact on its own might be sufficient to demonstrate a failure by petitioner to exercise ordinary and reasonable care in entering into the transaction and preparing the related tax returns. However, considering that petitioner (1) was a sophisticated taxpayer, (2) claims to have read the Winston & Strawn tax opinions in their entirety, (3) knew or should have known that Winston & Strawn's tax opinions based on the Deloitte appraisal reports were flawed, (4) was apprised of the risk that the proposed transactions might be classified as corporate tax shelters and registered them as such with the IRS around the same time it entered into the test transactions, and (5) proceeded with the transactions anyway, we find that petitioner disregarded the applicable rules and regulations. At a minimum, petitioner carelessly disregarded the rules and regulations by failing to "exercise reasonable diligence to determine the correctness of a return position." See sec. 1.6662-3(b)(2), Income Tax Regs. Moreover, petitioner's use of Winston & Strawn's tax opinions--flawed as the opinions were because of Winston & Strawn's interference with the independence of the appraisal reports that undergirded them--was misguided. We cannot condone the procuring of a tax opinion as an insurance policy against penalties where the taxpayer knew or

should have known that the opinion was flawed. A wink-and-a-smile is no replacement for independence when it comes to professional tax opinions.

We conclude that petitioner evinced disregard of rules and regulations within the meaning of section 6662 with respect to ascertaining the tax consequences of the test transactions. We further conclude that petitioner did not have reasonable cause and act in good faith within the meaning of section 6664(c). Accordingly, we uphold the accuracy-related penalties as determined by respondent for tax years 1999 and 2001. Because we have sustained the accuracy-related penalties on the ground of disregard of rules or regulations, we do not address the parties' arguments on a substantial understatement of income tax for the 1999 tax year.

C. OID Income

Petitioner argues that the OID income should not be a part of the penalties calculation under section 6662 because there was no guidance at the time petitioner filed its 1999 and 2001 returns that would suggest that the transactions could be recharacterized as loans, and petitioner could not anticipate this possibility. Petitioner also notes that respondent was inconsistent in his assertion of OID income in previous LILO/SILO cases.

Section 6662(a) imposes an accuracy-related penalty applicable "to any portion of an underpayment of tax required to be shown on a return". Section 6664(a) defines an underpayment as "the amount by which any tax imposed by this title exceeds the excess of--(1) the sum of--(A) the amount shown as the tax by the taxpayer on his return, plus (B) amounts not so shown previously assessed (or collected without assessment), over (2) the amount of rebates made." Neither section 6662 nor any other provision of the Code provides that an underpayment should be reduced because a taxpayer did not anticipate that the Commissioner would make a certain argument in litigating a tax case or because the Commissioner was inconsistent in his prior litigation strategy. We therefore find petitioner's argument without merit. We hold that the OID income should be included in the calculation of the underpayment subject to the section 6662 penalty for the 2001 tax year.

VIII. Conclusion

We have considered all of the arguments that petitioner made, and to the extent not discussed above, conclude that those arguments not discussed herein are irrelevant, moot, or without merit. We have considered respondent's arguments only to the extent stated herein.

To reflect the foregoing,

Decisions will be entered

under Rule 155.